No. 02-707

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 180

PANKRATZ FARMS, INC.,

Plaintiff, Counter-Defendant, Respondent and Cross-Appellant,

v.

MARVIN PANKRATZ,

Defendant, Counter-Claimant, and Appellant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

MARVIN PANKRATZ,

Plaintiff and Appellant,

v.

PANKRATZ BROTHERS, a Montana Partnership; PANKRATZ
GRAIN, a Montana Partnership; PANKRATZ TRUCKING,
a Montana Partnership; PANKRATZ FARMS, INC., a Montana
Corporation; DAVID PANKRATZ; DONALD PANKRATZ;
KENNETH PANKRATZ; and JAMES PANKRATZ,

Defendants, Respondents and Cross-Appellants.

APPEAL FROM:    District Court of the Seventeenth Judicial District,
                In and For the County of Valley, Cause Nos. DV 98-19492 and DV 98-10539,
                Honorable John C. McKeon, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

John J. Oitzinger, Attorney at Law; Helena, Montana; Peter O.
Maltese, Attorney at Law, Sidney, Montana

For Respondents:

K. Dale Schwanke, Jardine, Stephenson, Blewitt & Weaver,
Great Falls, Montana

Submitted on Briefs:  June 26, 2003
            Decided:  July 13, 2004

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 This case concerns a dispute between the partners and shareholders in a family farming and ranching operation conducted under the names of Pankratz Farms, Inc. (the "Corporation"), Pankratz Brothers (the "Partnership"), and Pankratz Grain ("Grain").

¶2 On May 15, 1998, the Corporation initiated an action against Marvin Pankratz ("Marvin"), seeking possession of a farm house that Marvin had occupied as an employee of the Corporation and Partnership. Marvin counterclaimed for wrongful discharge and oppression by the Corporation.

¶3 Marvin subsequently filed a separate cause of action in District Court against the Corporation, the Partnership, Grain, Pankratz Trucking, and the other partners, David Pankratz ("David"), Donald Pankratz ("Donald"), Kenneth Pankratz ("Kenneth"), and James Pankratz ("James") (collectively, "the Majority Partners") for breach of the partnership agreement, breach of fiduciary duty and the duty of good faith and fair dealing, conversion, and fraud. Marvin additionally sought judicial dissolution and winding up of the Corporation and Partnership and dissociation of the Majority Partners. He also requested a final accounting and imposition of a constructive trust. On May 7, 1999, Marvin's cause of action was consolidated with the Corporation's previously filed lawsuit.

¶4 A bench trial, with an advisory jury of five members, was held in March and April 2000. After extensive fact gathering, the District Court concluded that David, Donald, Kenneth, and James had breached the partnership agreement as well as their duties of loyalty and good faith and fair dealing, and ruled that the Partnership should be dissolved and its

business wound up. To assist in this task, the court ordered the appointment of a special master. However, Marvin's claims for wrongful discharge, fraud, conversion, oppression and judicial dissociation of the Majority Partners of the Partnership were denied and dismissed with prejudice.

¶5 On May 8, 2001, the District Court's Findings of Fact, Conclusions of Law, and Judgment and Decree ("Initial Findings") were amended. Among other changes, the Amended Findings of Fact, Conclusions of Law, and Decree ("Amended Findings") reflected the District Court's conclusion that Marvin had induced the Majority Partners to form Grain– and thereby breach their duties of loyalty and good faith and fair dealing–and was accordingly estopped from asserting damages as a result of the formation of the new partnership. The District Court additionally appointed Duane Smith ("Smith"), CPA, as special master, and stayed its decision on dissolution of the Partnership pending receipt of Smith's report.

¶6 Following completion of a limited accounting, the District Court issued Supplemental Findings of Fact, Conclusions of Law, and Order ("Final Order"), finding that although grounds existed for the dissolution of the Partnership, liquidation of the Partnership was not in the best interests of the individual partners, and therefore ordered Marvin to sell his interest back to the Partnership for $135,566, payable in annual amortized installments over fifteen years. Marvin appeals from the District Court's Initial Findings, Amended Findings, and Final Order, and the Corporation and Partnership cross-appeal from the court's failure

to award attorney fees and costs.  We affirm in part, reverse in part, and remand for further proceedings.

¶7     The following issues are raised on appeal:

¶8     1. Did the District Court err in failing to order the Partnership be dissolved and its business wound up?

¶9     2. Did the District Court properly determine the value of Marvin's Partnership interest?

¶10    3. Did the District Court err in concluding that Marvin was estopped to complain about the formation of Grain?

¶11    4. Did the District Court err in dismissing Marvin's claim for wrongful discharge?

¶12    5. Did the District Court err in dismissing Marvin's claim for oppression of a shareholder?

¶13    6. Did the District Court err in its appointment of the special master?

¶14    7.  Did the District Court err in limiting Attorney Archambeault's testimony on cross-examination?

¶15    8. Did the District Court improperly exclude testimony concerning the disposition of stock owned by Walter and Elizabeth Pankratz?

¶16    9. Did the District Court err in failing to award the Partnership and Corporation attorney fees and costs?

## FACTUAL BACKGROUND

4

¶17    Walter Pankratz ("Walter") and his brother, Londo Pankratz ("Londo"), began a small grain farming and cattle ranching enterprise in the 1950s, and owned land and farmed together in Valley County and Daniels County. The brothers separated their operations in the 1960s, but continued to cooperate in their respective farming operations.

¶18    With help from his wife, Elizabeth, and six sons, Marvin, David, Donald, Kenneth, James, and Larry Pankratz ("Larry"), Walter continued farming and ranching in Lustre, Montana, and established a successful business there. In 1975, he incorporated Pankratz Farms, primarily for estate planning purposes, and invited his eldest son, Marvin, to return home to work for the family business. Marvin accepted his father's invitation, and signed an employment agreement obligating him to perform "customary and usual work and services connected with the farming and ranching business." In return, the farm would provide room and board and pay a small monthly salary. Employees of the farm additionally received benefits such as medical insurance, transportation, and reimbursement for expenses incurred.

¶19    Shortly thereafter, Walter acquired a substantial farming and ranching operation approximately 60 miles northwest of Lustre, near Opheim, Montana. With the Corporation expanding its operation, all the brothers became active in the business. Marvin, Larry, and James lived and worked in Opheim, while David, Donald, and Kenneth lived and worked at the farm in Lustre. The six brothers began operating together as an informal partnership engaged in farming.

¶20    In 1978, the brothers entered a written partnership agreement in order to formalize their operations and thereby become eligible for funds available through the federal

5

Agricultural Stabilization and Conservation Service, the predecessor to the Farm Service Agency ("FSA"). Among other things, the partnership agreement provided for equal sharing of profits and losses, and required unanimous agreement on all actions or decisions affecting the Partnership, including decisions to pledge or transfer any interest or equity in the Partnership, or to endorse a note.

¶21 Initially, the Partnership leased land owned by the Corporation on a crop-share basis. Over time, the Partnership acquired its own real estate, livestock, and machinery; however, the Partnership and Corporation continued to collaborate in many areas of the business, and often shared equipment and supplies.

¶22 Dissension among the brothers began to surface in the mid to late 1980s, and they became noticeably divided. Around 1985, David, Donald, Kenneth, and James, formed a separate partnership known as Pankratz Trucking ("Trucking"), which provided transportation services for the Corporation and the Partnership at fees consistent with those being charged in the open market. At about the same time, David, Donald, and Kenneth began leasing lands from Londo. David, Donald, and James also leased lands owned by their father. Meanwhile, Larry acquired leased properties of his own.

¶23 The brothers' differences made operating the Partnership through unanimous agreement difficult. In 1991, the Partnership Agreement was amended to provide for actions and decision-making by a 2/3 vote of those interested in the Partnership. However, the provisions of the 1978 agreement forbidding a partner from borrowing money in the

Partnership's name, or leasing, mortgaging, or transferring interests in the Partnership without the prior written consent of the other partners were left unchanged.

¶24    Walter remained active in the Corporation until his retirement in 1993. When Walter had incorporated the family farm in 1975, he was the majority stockholder with 645 shares. Over the years that followed, Walter had gifted stock in the Corporation to each of his sons. As a result of this gifting, by 1994 each of the six sons owned 87 shares of stock, and Walter and Elizabeth held only 75 shares of stock each.

¶25    In June of 1995, James replaced Larry as the president of the Corporation, due in part to Larry's alleged failure to cooperate in obtaining operating funds. Discussions to terminate Marvin and Larry's employment with the Corporation began shortly thereafter. Meanwhile, Marvin's relationship with his brothers continued to deteriorate.

¶26    The next two years involved a series of negotiations for the purchase of Marvin's and Larry's interests in the Partnership and Corporation. With the help of Tim Christensen ("Christensen") and Dudley Shy, financial consultants, the Majority Partners made the first of several offers to purchase Marvin's interest on December 12, 1996. The Majority Partners proposed purchasing Marvin's 87 shares in the Corporation for $221,350 and his 1/6th interest in the Partnership for $114,491, payable in installments over ten years at 6 percent interest. Implementation of this proposal included termination of Marvin's employment, payment of a demand note to Marvin, and the creation of an escrow account in which installment payments could be deposited.

7

¶27 On February 24, 1997, each of the partners met to formally discuss the proposal, with Christensen serving as the facilitator. Marvin was informed that the land values used in preparing the offer were based upon Christensen's experience and his discussions with a Farm Credit Services appraiser. He was further advised that he was not required to accept any proposal to buy his interest and that, should he remain an owner, he would continue to share in the profits and losses even though he may not be an employee of the entity. On March 1, 1997, Marvin rejected this proposal in writing and expressed his belief that it was "a waste of time and money of all parties involved to pursue this matter any further." Marvin further advised the Majority Partners that he wished to receive 100 percent of his interest in the Corporation and Partnership in the form of real estate.

¶28 Despite Marvin's expressed disinterest in attending any more buy-out meetings, another joint meeting between the Partnership and the Corporation was held on March 25, 1997. Marvin again announced his rejection of the previous buy-out offer. Christensen then presented an Operating Agreement, applying to both the Corporation and the Partnership, which provided for two weeks' notice of termination of employment for failure to satisfactorily perform operational duties. The agreement also called for assignment of duties and centralized management through the board of directors. After considerable discussion of job assignments, David was selected as the farm and ranch foreman, and Donald was

instructed to complete the drafting of the Operating Agreement and submit it for approval by May 1, 1997.[1]

¶29 Salaries of employees of the Corporation were occasionally altered by practice of the parties. At times, wages were paid in wheat. In early May 1997, the Corporation reduced the monthly salary of its employees from $500 to $50 per month. Other benefits were not affected by the pay reduction.

¶30 On June 6, 1997, David assigned Marvin several operational tasks, some of which involved traveling to Walter and Elizabeth's home in Lustre, approximately 65 miles away. Marvin performed some, but not all, of the assigned duties. On June 23, 1997, Marvin received a notice formally terminating his employment for "failure to perform duties assigned." The notice advised Marvin to vacate his residence, which belonged to the Corporation, by July 31, 1997.

¶31 Negotiations for the purchase of Marvin's interest in the Corporation and Partnership thereafter resumed, and continued through July and August 1997. During this time, Marvin's attorney made three proposals whereby Marvin could receive assets and continue farming. However, each proposal involved a transfer of land individually owned by Walter. Walter refused to sell his land, and each proposal was rejected as unacceptable.

¶32 On July 31, 1997, Marvin was offered a "compromise" cash buy-out of $380,000 payable over a period of fifteen years. Although the offer was approximately $44,000 more

---

[1]Although Marvin admits receiving a copy of the agreement in final form in late May or early June 1997, there is no record showing the date of final approval.

than the offer made in March 1997, Marvin rejected the proposal, and negotiations to purchase Marvin's interest broke off sometime after September 1997.

¶33    Having reached an impasse in their negotiations with Marvin, the Majority Partners turned to Larry, seeking a buy-out of his interests in the Corporation and Partnership.  In early January 1998, David, Donald, Kenneth, and James negotiated a buy-out of Larry's interest in both companies for the sum of $420,000.  With the purchase of Larry's interest, David, Donald, Kenneth, and James, each obtained an additional 4 percent ownership interest in the Partnership.  This notwithstanding, no accounting of the capital and income of the Partnership was performed.

¶34    Around the same time as the purchase of Larry's interest, the Majority Partners approached Marvin requesting his signature on papers necessary to qualify the Partnership for funds available through the FSA.  Since 1978, the Partnership had qualified for benefits under this government program.  However, Marvin refused to sign the documents.

¶35    In order to avoid losing the FSA benefits, David, Donald, Kenneth, and James formed a new partnership known as Pankratz Grain, the stated purpose of which was to conduct a general grain farming and livestock operation.  Initially, Grain had a net value of only $1,000.  However, to qualify and remain qualified for the FSA benefits, Grain leased farm lands and equipment from the Partnership.  Additionally, the Partnership's land was mortgaged to secure operating funds for Grain.  Marvin did not consent to this arrangement.

¶36    To assure the continued receipt of the FSA benefits, Grain continued its use of the Corporation and Partnership's property.  By the time of trial, Grain had replaced the

Partnership as a primary operating entity. Despite this, the records maintained by Grain failed to adequately identify which lands had produced the crop, or otherwise allocate revenues and equipment between the various entities. As a result, it became necessary at trial to perform a detailed accounting of the transactions between Grain and the Partnership since 1998 in order to determine the share of property, profit, or benefit to which the Partnership was properly entitled.

¶37 Following his termination of employment, Marvin refused to vacate the farm house provided by the Corporation, and kept the premises locked. In early 1998, the Corporation initiated legal action to evict Marvin from the farm house he had occupied for much of the previous twenty-three years as an employee of the Corporation. Marvin counterclaimed for damages for wrongful discharge and oppression, and sought dissolution of the Corporation, or any other appropriate remedy for the Majority Partners' breaches of duties.

¶38 On October 1, 1998, Marvin brought a separate cause of action against the Corporation, the Partnership, Grain, Trucking, and the Majority Partners, asserting claims for breach of the partnership agreement, breaches of fiduciary duties, conversion, and fraud, and requesting judicial dissociation of the remaining partners, dissolution of the Partnership, and a final accounting. Marvin and the Corporation's actions were thereafter consolidated.

¶39 The consolidated cases were brought for trial before the District Court and an advisory jury in March and April 2000. The jury returned an advisory verdict on April 8, 2000. Among other things, the jury found that the Corporation had not breached its fiduciary duties to Marvin, nor wrongfully discharged his employment, or denied him access to

records. The advisory jury further concluded that Marvin had failed to make a prima facie showing of fraud or oppression by the Corporation. However, the jury also found that David, Donald, Kenneth, and James, as individual partners of the Partnership, had breached their duties of loyalty and good faith and fair dealing, and had breached the partnership agreement by mortgaging the Partnership's property in order to secure the purchase of Larry's interests in the Corporation and the Partnership, and by leasing Partnership property to Grain without first obtaining Marvin's consent.

¶40 After receiving objections from the parties, the District Court adopted the advisory jury's findings and conclusions, and ordered the Partnership to be dissolved and its business wound up. To facilitate the necessary accounting, the court ordered the appointment of a special master, and provided each party thirty days to nominate an appropriate individual.

¶41 Shortly thereafter, both parties moved to alter or amend the decree. On May 8, 2001, the District Court entered its Amended Findings. The changes made therein included a finding that Marvin knew about the Majority Partners' purchase of Larry's interest in the Partnership and Corporation, and elected not to participate in the same. The court also found that Marvin was estopped from complaining about the creation of the new partnership as his refusal to sign documents associated with the FSA benefits program induced the Majority Partners to form Grain. To assist in the task of performing an accounting of the Partnership, the District Court appointed Duane Smith, CPA, as special master and stayed its decision on dissolution of the Partnership pending receipt of Smith's report. Finally, the court dismissed with prejudice each of Marvin's claims against the Corporation as well as his claims against

the Partnership for the wrongful denial of access to Partnership records and information, conversion, and judicial dissociation.

¶42 After receiving Smith's initial and supplemental reports, and following a hearing and objections by the parties, the District Court concluded that it was not reasonable to expect the Partnership to renew farming operations. However, the court recognized that judicial dissolution of the Partnership would trigger significant adverse tax consequences to all the parties involved, including Marvin. Therefore, because Marvin had requested his monetary damages to include a purchase of his interest in the Partnership, the District Court found that a fair and equitable resolution would be for Marvin to sell his interest in the Partnership to the Majority Partners. Upon weighing the evidence presented and adjusting it to reflect expenses incurred by the Partnership in successfully defending several of Marvin's claims, the court concluded that $135,566 represented a fair value for Marvin's one-sixth interest in the Partnership and ordered him to sell his interest to the Partnership, payable in annual amortized installments over fifteen years, at 7.5 percent interest.

¶43 This appeal followed.

## STANDARD OF REVIEW

¶44 We review a district court's findings of fact to determine whether the findings are clearly erroneous. *Hidden Hollow v. Field*, 2004 MT 153, ¶ 21, 321 Mont. 505, ¶ 21, __ P.3d ___. A district court's findings are clearly erroneous if substantial credible evidence does not support them, if the trial court has misapprehended the effect of the evidence or if a review of the record leaves this Court with the definite and firm conviction that a mistake

13

has been committed. *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, ¶ 19, 53 P.3d 870, ¶ 19. We review a district court's conclusions of law for correctness. *Hidden Hollow,* ¶ 21.

## DISCUSSION

**¶45    Did the District Court err in failing to order the Partnership be dissolved and its business wound up?**

¶46    Although the District Court found that grounds existed for the dissolution and winding up of the Partnership pursuant to § 35-10-624(5), MCA, it nonetheless refused to order dissolution because it found that doing so would result in significant adverse tax consequences for all the parties involved. Instead, the court ordered Marvin to sell his one-sixth interest in the Partnership to the remaining partners, and allowed the Partnership to continue in existence.

¶47    The parties concede that the partnership agreement does not apply to a situation involving judicial dissolution of the Partnership. However, Marvin contends that the court's order requiring him to sell his interest in the business and failing to order the dissolution and winding up of the Partnership is contrary to the plain language of § 35-10-624(5), MCA, which provides for dissolution and winding up of a partnership business upon satisfaction of certain conditions. The Partnership responds that the adjudicated relief is not in contravention to the statute since Marvin requested monetary damages as an alternative to dissolution.

¶48    It is true that Marvin requested alternative relief in the form of monetary damages. Although the rules of civil procedure permit a party to request alternative forms of relief, *see* Rule 8(a), M.R.Civ.P., the relief requested must nonetheless be available as a matter of law.

14

For the following reasons, we conclude that an award of monetary damages was not available in this case.

¶49     We recently addressed a situation similar to this case in *McCormick v. Brevig*, 2004 MT 179, 322 Mont. 112, ___ P.3d ___.  At issue in *McCormick* was whether the district court erred in failing to order the liquidation of a brother-sister ranching partnership after determining that dissolution of the partnership was warranted under § 35-10-624(5), MCA. Like the case *subjudice*, the district court in *McCormick* elected to allow the remaining partner to purchase the other's interest in the partnership, rather than mandate a forced sale of all the partnership assets.  *McCormick*, ¶ 29.  After reviewing the law of partnerships, and the development of the Uniform Partnership Act ("UPA"), and the Revised Uniform Partnership Act ("RUPA"), adopted in Montana in 1947 and 1993, respectively, we concluded that the plain language of § 35-10-624(5), MCA, required liquidation of the partnership assets through a forced sale, and distribution of the net surplus *in cash* to the partners.  *McCormick*, ¶ 45.  We conclude that § 35-10-624(5), MCA, demands a similar result here.  That statute provides in relevant part:

> **Events causing dissolution and winding up of partnership business.**
> . . .
> (5) a judicial decree, issued upon application by a partner, that:
> (a) the economic purpose of the partnership is likely to be unreasonably frustrated;
> (b) another partner has engaged in conduct relating to the partnership business that makes it not reasonably practicable to carry on the business partnership with that partner; or
> (c) it is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement[.]

¶50 In the present case, the District Court specifically found that, under § 35-10-624(5)(a) and (c), MCA, good cause existed to dissolve the Partnership and wind up its affairs. In support of this conclusion, the District Court held:

> The most apparent result of all this litigation is that it is no longer reasonably practicable for [the Partnership] to remain a viable partnership in its current form. Considerable animosity exists between MARVIN and the other partners. This animosity adversely impacts the efficient and proper operation of [the Partnership]. [The Partnership] was formed and existed for the economic purpose of conducting a farming operation. Due primarily to considerable animosity and MARVIN'S desire to seek leverage with his partners, the farming operation formerly operated by [the Partnership] has now become the farming operation of GRAINS. GRAINS no longer needs to lease [the Partnership's] real property to obtain farm program benefits. Nonetheless, it is not reasonable to expect [the Partnership] to renew any farming operation.

Thus, the District Court recognized that the business of the Partnership had been effectively transferred to Grain, that there was no reasonable expectation that the Partnership would resume farming operations in the future, and that the economic purpose of the Partnership had been unreasonably frustrated by Marvin's efforts to gain leverage against the Majority Partners. This notwithstanding, the District Court refused to order dissolution of the Partnership.

¶51 It is well established that "in construing a statute, 'the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.'" *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 115, 303 Mont. 274, ¶ 115, 16 P.3d 1002, ¶ 115; *see also* § 1-2-103, MCA. Here, § 35-10-624(5), MCA, clearly requires dissolution and winding up of a partnership upon entry of a judicial decree, which has been issued upon the application of a partner, finding

16

that the economic purpose of the partnership is likely to become unreasonably frustrated, or that it is not reasonably practicable to carry on the partnership in conformity with the partnership agreement. This being such a case, we conclude the District Court erred in failing to order the dissolution and winding up of the Partnership. We therefore reverse the District Court's order requiring the buy-out of Marvin's one-sixth interest in the Partnership, and remand this matter to the District Court for proceedings consistent with the Revised Uniform Partnership Act, § 35-10-101 et seq., MCA, to liquidate the Partnership assets, satisfy Partnership obligations, and distribute the net surplus in cash to the partners in accordance with their respective interests.

¶52 **Did the District Court properly determine the value of Marvin's Partnership interest?**

¶53 Marvin raises several sub-issues in support of his claim that the District Court erred in valuing his interest in the Partnership, including whether the District Court erred as to the timing of valuation, the manner of valuation, and whether a proper accounting was performed. Given our foregoing conclusion that the Partnership must be dissolved and its business wound up, we need not address the merits of these sub-issues. We note, however, that "when an action for an accounting is being used to wind up a partnership's affairs, the court is obligated to provide 'for a full accounting of the partnership assets and obligations and distribution of any remaining assets or liabilities to the partners in accordance with their interests in the partnership.'" *McCormick*, ¶ 49 (citation omitted). Accordingly, it will be necessary, upon remand, for the District Court to provide a full accounting of the

17

Partnership's affairs. That is not to say, however, that the District Court may not build off of the accountings already performed.

¶54 Marvin also raises arguments concerning the District Court's determination of his fractional interest in the Partnership and its allocation of attorney fees. Because these are issues which will influence the District Court's resolution of this matter on remand, we address them in turn.

¶55 *A. Marvin's Fractional Interest*

¶56 When negotiations to purchase Marvin's interest in the Partnership proved unfruitful, the Majority Partners turned to Larry for the purchase of his interest. They ultimately succeeded in buying Larry's interest in the Partnership for the sum of $420,000, payable over a period of years. To secure future payments owing to him, Larry received a mortgage in an undivided 20/24th interest in lands owned by the Partnership. The 1/6th interest not mortgaged represented Marvin's interest.

¶57 Although the District Court found that the Majority Partners had breached their duties of loyalty to Marvin by mortgaging the Partnership's property without his consent, the court concluded that Marvin was not damaged by the breach since he retained the same 1/6th ownership interest in the Partnership and was not obligated to Larry by reason of the purchase. The court further noted that Marvin had been aware of the negotiations to purchase Larry's interest and had elected not to participate. As a result of the purchase of Larry's interest, the Majority Partners each held an additional 4 percent ownership interest in the Partnership.

18

¶58 Although his brief is somewhat unclear on this point, Marvin apparently argues that the District Court erred in computing his interest in the Partnership as 16 percent, and not as 20 percent, because the finding that he chose not to participate in the purchase of Larry's interest was not supported by substantial evidence.

¶59 Once again, a district court's findings of fact must be supported by substantial evidence, which is the amount of relevant evidence a reasonable mind might accept as adequate to support a conclusion. *Swandal Ranch Co. v. Hunt* (1996), 276 Mont. 229, 235, 915 P.2d 840, 844. In this case, a review of the record provides the necessary support for the District Court's finding that Marvin was aware of the negotiations to purchase Larry's interest and declined to participate. At trial, Marvin testified that he first became aware of negotiations to purchase Larry's interest following his rejection of the Partnership's offer to purchase his own interest in the Partnership in March 1997. Marvin conceded that, although he received notices of meetings wherein the purchase of Larry's interest was discussed, he failed to attend any of these meetings. Consequently, Marvin was not present when the Partnership officially purchased Larry's interest on December 30, 1997. Nonetheless, Marvin testified that Larry informed him about the purchase of his interest in the Partnership the following day. Given Marvin's own admissions, the District Court did not err in finding that Marvin was aware of the negotiations that were taking place at that time.

¶60 Furthermore, the District Court concluded, and we agree, that Marvin has not demonstrated any damages incurred as a result of the Majority Partners' breaches of duty and of the partnership agreement. Marvin's interest in the Partnership was not mortgaged as a

19

result of the purchase of Larry's interest, nor did he in any way become obligated to Larry by reason of the purchase. Accordingly, we conclude the District Court correctly computed Marvin's fractional ownership interest in the Partnership.

¶61    *B. Attorney Fees*

¶62    The parties incurred substantial attorney fees in this action. The Partnership incurred fees in excess of $82,200. The Corporation incurred over $100,000 in attorney fees. Grain paid approximately $380 in fees and an additional $6,350 for the special master. Together, the Corporation, Partnership, Grain, and the four partners successfully defended against claims by Marvin for wrongful discharge, oppression to minority shareholder, fraud, accounting of corporate records, wrongful denial of access to corporate records, breach of duty of good faith, care, and fair dealing to a shareholder, dissolution of corporation, wrongful denial of access to partnership records and information, conversion, and judicial dissociation of partnership. Marvin did prevail on claims against Grain and its four partners, David, Donald, Kenneth, and James, for breach of fiduciary duties; however, the District Court concluded that the damage caused by these breaches was minimal. Based upon the special master's credible accounting and the context in which the claims were made, the court concluded that Grain's four partners benefitted from the Partnership's payment of attorney fees in defending the breach of fiduciary duty claims in the amount of $2,400. As a 1/6th owner in the Partnership, the court concluded that Marvin was entitled to $400 of this amount, to be paid individually by the remaining partners of the Partnership. However, the court also recognized that the fair market value of Marvin's 1/6th interest in the Partnership

20

should reflect the expense incurred by the Partnership in successfully defending against several of his claims. Therefore, after crediting the $2,400 benefit to the Partnership, the court charged 1/6th of the remaining expense, or $13,334, against Marvin's 1/6th interest in the Partnership.

¶63    Marvin contends that by charging him with 1/6th of the attorney fees incurred by the Partnership, the District Court effectively assessed attorney fees against him in violation of the American Rule. As Marvin correctly points out, generally the prevailing party in a civil action is not entitled to attorney fees absent a specific statutory or contractual provision. *Harland v. Anderson Ranch Co.*, 2004 MT 132, ¶ 44, 321 Mont. 338, ¶ 44, ___ P.3d ___. In this case, however, the District Court did not award attorney fees in violation of the American Rule, but merely ascertained the value of Marvin's interest in the Partnership after considering expenses incurred by the Partnership in successfully defending against Marvin's numerous claims. Furthermore, the court correctly charged Grain and its individual partners with the fees incurred as a result of their breaches of duties, and excluded this amount from the total amount owed by Marvin and the Partnership. Thus, contrary to Marvin's assertions, the District Court did not err in determining his respective share of the Partnership's profits and benefits as a result of its consideration of attorney fees.

¶64    **Did the District Court err in concluding that Marvin was estopped to complain about the formation of Grain?**

¶65    As a result of Marvin's refusal to sign documents necessary to qualify the Partnership for benefits available through the FSA, the Majority Partners formed Grain and caused it to be operated in such a fashion as to qualify for the FSA benefits. The District Court

concluded the partners were justified in doing so, and held that Marvin was estopped from claiming damages due to the formation of the new partnership and its subsequent leasing of Partnership property.

¶66    Marvin argues that the essential elements of equitable estoppel are not supported by clear and convincing evidence.  He asserts that the court erred in finding that his refusal to sign the necessary FSA paperwork induced the Majority Partners to form Grain.  In response, the Partnership maintains that the record clearly supports the court's findings and conclusions, and that Marvin was properly estopped from claiming the benefit from his own wrong.

¶67    It is well settled that six elements are necessary to establish an equitable estoppel claim:  (1) the existence of conduct, acts, language, or silence amounting to a representation or concealment of material facts; (2) the party estopped must have knowledge of these facts at the time of the representation or concealment, or the circumstances must be such that knowledge is necessarily imputed to that party; (3) the truth concerning these facts must be unknown to the other party at the time it was acted upon; (4) the conduct must be done with the intention or expectation that it will be acted upon by the other party, or have occurred under circumstances showing it to be both natural and probable that it will be acted upon; (5) the conduct must be relied upon by the other party and lead that party to act; and (6) the other party must in fact act upon the conduct in such a manner as to change its position for the worse. *Selley v. Liberty Northwest Ins. Corp.,* 2000 MT 76, ¶ 10, 299 Mont. 127, ¶ 10,

998 P.2d 156, ¶ 10 (citations omitted). All six elements must be established by clear and convincing evidence before the doctrine can be invoked. *Selley*, ¶ 10.

¶68 We conclude that each of the elements of equitable estoppel are present in this case, and, therefore, that Marvin is estopped from claiming damages as a result of the formation of Grain. The record is clear that Marvin knew of the history and significance of the FSA benefits to the graining operation and refused to sign the necessary documentation shortly before the sign-up deadline. Marvin's purported reason for refusing to sign the paperwork was that he believed doing so would transfer the program benefits to Grain. However, the FSA application clearly applied to the Partnership only. Furthermore, Marvin was familiar with the application process given the fact that the Partnership had been formed in order to qualify for benefits available through government farming programs, and had received such benefits every year since 1978. Under these circumstances, Marvin's refusal to sign the requisite documentation amounted to a representation or concealment of material fact, which Marvin knew, or reasonably should have known, the other partners would rely upon.

¶69 Furthermore, the record supports the District Court's finding that when the Majority Partners took action to qualify Grain for benefits under the FSA program, they did not know whether Marvin would change his position and sign the documents on behalf of the Partnership. Faced with a frustrating lack of cooperation from Marvin, and a sign-up deadline for the FSA benefits, the Majority Partners did not have time to seek a judicial dissolution of the Partnership. In order to preserve an important source of income, the Majority Partners formed Grain and leased certain property from the Partnership in order to

23

operate a farming business thereunder. While this change in operating structure facilitated the continued receipt of FSA benefits, it occurred to the detriment of the partners since it resulted in a substantial obligation to the Partnership to perform detailed accountings. Because estoppel is based upon the equitable principle that a party cannot, through his intentional conduct, act, or omission, induce another party to unknowingly and detrimentally alter its position, and then subsequently deny the just and legal consequences of his conduct, act, or omissions, *see* § 26-1-601, MCA, and each of the six elements of equitable estoppel have been satisfied, we hold the District Court did not err in concluding Marvin was estopped from claiming damages as a result of the formation of Grain or its subsequent leasing of Partnership property.

¶70 **Did the District Court err in dismissing Marvin's claim for wrongful discharge?**

¶71 Marvin argues that the Corporation's issuance of pay-cuts in May 1997 constituted a breach of the employment agreement, and effectively terminated his employment well before he received formal notice of his discharge on June 23, 1997. The Majority Partners concede that the Corporation reduced each of its employees' salaries from $500 to $50 per month in May 1997, only to restore the salaries and satisfy the arrearages for the Majority Partners following Marvin's termination from employment, but contend the Corporation was justified in doing so. For the reasons set forth below, we conclude the District Court did not err in denying Marvin's claim for wrongful discharge.

¶72 Under Montana's Wrongful Discharge from Employment Act, § 39-2-901 et seq., MCA, an employer must have good cause to discharge a non-probationary employee from

24

employment. "Good cause" is defined in the Act as reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason. Section 39-2-903(5), MCA. The Act also recognizes situations in which an employee is forced to voluntarily terminate his or her employment as a result of working conditions which have been made intolerable by the employer. This type of situation is known as "constructive discharge" and is no less wrongful than an actual firing without cause. *Jarvenpaa v. Glacier Electric Co-Op, Inc.* (1995), 271 Mont. 477, 480, 898 P.2d 690, 692. The determination of whether an employee has been constructively discharged rests with the finder of fact who must decide, under the totality of circumstances, whether the employer has rendered working conditions so intolerable that resignation is the only reasonable alternative. *Jarvenpaa*, 271 Mont. at 481, 898 P.2d at 692.

¶73    In this case, there is no evidence that Marvin voluntarily terminated his employment with the Corporation following the pay-cuts. Rather, he continued to reside in the Corporation's ranch house and performed operational tasks for the farming operation, such as repairing fence. While Marvin was receiving a greatly diminished salary for his services, the record shows that these pay-cuts were consistent with past practices of reducing salaries for economic purposes and occasionally paying wages in wheat. Furthermore, the salary cuts affected each of the partners equally and other benefits remained intact. Accordingly, Marvin's argument that the Corporation effectively terminated his employment when it

25

issued pay-cuts in May 1997 is without merit because Marvin remained in the active employ of the Corporation.

¶74 Furthermore, good cause existed for Marvin's termination from employment the following June when he refused to perform duties assigned to him. As the District Court found, these duties (i.e., cleaning out feeders and repairing a chicken coop) were reasonable directives given the nature of the farming operation. As such, Marvin's failure to perform these duties gave rise to reasonable job-related grounds for his termination. Accordingly, the District Court did not err in dismissing Marvin's wrongful discharge claim.

¶75 **Did the District Court err in dismissing Marvin's claim for oppression of a shareholder?**

¶76 Marvin contends generally that the Majority Partners acted in a manner which was oppressive to him as a shareholder in negotiating the sale of his interest in the Corporation. The term "oppression" has been defined as "harsh, dishonest or wrongful conduct and a visible departure from the standards of fair dealing which inure to the benefit of majority and to the detriment of the minority." *Fox v. 7L Bar Ranch Co.*(1982), 198 Mont. 201, 209, 645 P.2d 929, 933. Generally speaking, directors or those in control of a corporation have a duty not to act in a manner which is oppressive to minority shareholders. *See* § 35-1-938(2)(b), MCA.

¶77 In this case, the District Court found that the Corporation and those in control of the Corporation did not operate in such a harsh, dishonest, or wrongful manner as to be oppressive to minority shareholder Marvin. Marvin's discharge from employment was based on reasonable job-related grounds. Proper management authority was exercised in adopting

26

the Operating Agreement and in assigning work tasks. Marvin was included in corporate efforts to restructure management and job assignments. The Corporation made reasonable efforts to negotiate a cash or installment purchase of Marvin's interest based on fair market value. Marvin had expressed a desire to operate on his own and suggested a buy-out which included properties individually owned by Walter. However, the Corporation could not control Walter's decision not to include his individually owned properties in a transaction with Marvin. Ultimately, it was Marvin's failure to present a workable alternative or respond with a cash offer that resulted in the termination of negotiations for the purchase of his interest in the Corporation.

¶78 Marvin does not challenge these findings on appeal, nor has he presented any evidence which would compel a conclusion different than that reached by the District Court. Because this Court will not set aside a district court's findings of fact unless clearly erroneous, and Marvin has not demonstrated that to be the case here, we hold the District Court was correct in dismissing Marvin's claim for oppression.

¶79 **Did the District Court err in its appointment of the special master?**

¶80 Marvin contends that the District Court erred in appointing Duane Smith, CPA, the principle accountant for the Corporation and Partnership since 1985, as special master. He maintains that Smith was biased in favor of the Majority Partners.

¶81 Rule 53, M.R.Civ.P., allows a district court to appoint a master in complicated cases to examine the matter and make a report thereon. *See Maloney v. Home and Investment Center, Inc.*, 2000 MT 34, ¶ 28, 298 Mont. 213, ¶ 28, 994 P.2d 1124, ¶ 28. In the present

case, the parties each nominated an individual to serve as special master. The District Court found that Marvin's nominee lacked the requisite accounting background to conduct and supervise the accounting required of the Majority Partners. On the other hand, Smith possessed the skills and experience necessary to perform the accounting. Although Smith had previously testified in the proceedings, the District Court concluded that Smith was subject to accounting standards of practice and ethics that sufficiently qualified him to serve as special master with limited powers and duties. Given these findings, which Marvin does not challenge on appeal, we conclude the District Court did not abuse its discretion in appointing Smith as special master.

¶82   We note that Marvin asks this Court to remove Smith as special master on remand and cites *Schweiker v. McClure* (1982), 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1, for the proposition that due process demands impartiality on the part of all those who serve in a judicial or quasi-judicial capacity. However, whether a special master should be held to the same disqualification standards as judges is a question which has split the circuits. *See Morgan v. Kerrigan* (1st Cir. 1976), 530 F.2d 401, 426, *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (since masters are subject to the control of the court, they need not be held to the strict standards of impartiality that apply to judges); *Jenkins v. Sterlacci* (D.C. Cir. 1988), 849 F.2d 627, 630-32 (special masters must be held to the same standards of disqualification as judges). In this case, Marvin did not bring a motion for disqualification in District Court, and has not presented any authority on appeal in support of his position that Smith should be disqualified on remand. Rule 23(a)(4), M.R.App.P., provides that the

28

"argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and pages of the record relied on." Furthermore, we have stated, "it is not this Court's obligation to conduct legal research on appellant's behalf, to guess as to his precise position, or to develop legal analysis that may lend support to his position." *In re Estate of Bayers,* 1999 MT 154, ¶ 19, 295 Mont. 89, ¶ 19, 983 P.2d 339, ¶ 19. Therefore, while we conclude the District Court did not abuse its discretion in appointing Smith as special master, we decline to address Marvin's argument that Smith's findings must be rejected as not being impartial, or that he be removed as special master on remand.

**¶83   Did the District Court err in limiting Attorney Archambeault's testimony on cross-examination?**

¶84   At trial, the Majority Partners offered the testimony of Gerald Archambeault, an attorney for the family farming operation since the mid 1980s. Marvin objected to the admission of Archambeault's testimony on the basis that the Majority Partners were continuing to assert the attorney-client privilege, and the District Court overruled the objection. On appeal, Marvin contends the District Court impermissibly limited the scope of cross-examination by ruling that Archambeault did not have to respond to questions concerning the formation of the new partnership. While Marvin provides a citation to the record in support of his contention, a review of the record reveals no such ruling by the District Court. Admission of testimony is a matter of discretion for the trial court, and its decision will not be disturbed absent a showing of abuse of that discretion. *In re Marriage*

*of Nies and Cooper*, 2003 MT 100, ¶ 29, 315 Mont. 260, ¶ 29, 68 P.3d 697, ¶ 29. In this case, Marvin has not provided any evidence of the alleged error, much less demonstrated an abuse of discretion on the part of the District Court. Consequently, we cannot conclude the District Court erred in this regard.

**¶85   Did the District Court improperly exclude testimony concerning the disposition of stock owned by Walter and Elizabeth Pankratz?**

¶86   Shortly before trial, Marvin moved to amend his pleadings to add numerous claims, including intentional interference with business relations and intentional interference with prospective economic advantage. The District Court denied his requests as untimely. Some time later, the court granted the Majority Partners' motion in limine to exclude testimony regarding the estates and estate planning of Walter and Elizabeth. Marvin argues that such testimony was relevant to the likely disposition of the percentage of the Corporation owned by his parents and maintains that he was prejudiced as a result of his inability to inquire into such matters.

¶87   The disposition of Walter's and Elizabeth's interests in the Corporation was not itself an issue before the District Court, and was not relevant to any issue pending therein. Once again, the District Court has broad discretion in determining evidence which is relevant and admissible and we will not overturn the court's determination absent an abuse of discretion. *See Jenks v. Bertelsen*, 2004 MT 50, ¶ 12, 320 Mont. 139, ¶ 12, 86 P.3d 24, ¶ 12. Here, we conclude the District Court appropriately exercised its discretion in excluding irrelevant testimony.

**¶88 Did the District Court err in failing to award the Partnership and Corporation attorney fees and costs?**

¶89 In its Amended Findings, the District Court concluded that each party should pay its own attorney fees and costs. The Majority Partners maintain that, as the prevailing parties, both the Partnership and the Corporation are entitled to costs.

¶90 Costs are generally allowable to the prevailing party pursuant to Rule 54(d), M.R.Civ.P., unless the court directs otherwise, except when expressly provided by statute. *Erickson v. Dairyland Ins. Co.* (1990), 241 Mont. 119, 124, 785 P.2d 705, 708. In this case, costs to defendant are statutory pursuant to § 25-10-102, MCA, which provides costs to defendant upon a judgment in his favor in actions mentioned in § 25-10-101, MCA. Moreover, it appears the Corporation prevailed on every claim in Marvin's complaint and, therefore, is entitled to its costs, which should be determined on remand.

¶91 However, we conclude the Partnership did not prevail in this matter as it must be dissolved pursuant to § 35-10-624(5), MCA. Accordingly, the District Court did not abuse its discretion in denying costs to the Partnership.

¶92 The Majority Partners next argue that the Partnership and Corporation are entitled to attorney fees pursuant to the equitable exception established by this Court in *Foy v. Anderson* (1978), 176 Mont. 507, 580 P.2d 114. For the reasons set forth below, we decline to extend the ruling under *Foy* to the present case.

¶93     The longstanding rule in Montana, also known as the American Rule, is that, absent a contractual or statutory provision to the contrary, attorney fees will not be awarded to the prevailing party in a lawsuit. *Erker v. Kester*, 1999 MT 231, ¶ 43, 296 Mont. 123, ¶ 43, 988 P.2d 1221, ¶ 43 (citing *e.g.*, *Tanner v. Dream Island, Inc.* (1996), 275 Mont. 414, 429, 913 P.2d 641, 650 (citing *Howell v. State* (1994), 263 Mont. 275, 285, 868 P.2d 568, 574; *Goodover v. Lindy's Inc.* (1992), 255 Mont. 430, 445, 843 P.2d 765, 774)). In the present case, neither a statutory nor contractual basis for an award of attorney fees has been demonstrated. Nonetheless, in rare instances a district court may award attorney fees to an injured party under its equity powers. *Foy*, 176 Mont. at 511-12, 580 P.2d at 116-17. Such awards are to be determined on a case-by-case basis, and only when a party has been forced to defend against a wholly frivolous or malicious action. *Foy,* 176 Mont. at 511, 580 P.2d at 117.

¶94     While it is true that Marvin did not prevail on numerous claims, it cannot be said that his action is totally without merit. Under the circumstances, good cause existed for the dissolution and winding up of the Partnership. Furthermore, the District Court concluded, and we agree, that an award of attorney fees was not justified due to the existence of substantial family dissension, violations of certain fiduciary duties, need for accounting and possible judicial dissolution of the Partnership, differing application of the equitable estoppel principles, and the fact that the Corporation, the Partnership, Grain, and the four individually named defendants joined in presenting their defense. Therefore, we hold that *Foy's* narrowly

defined "equitable" exception to the general attorney fees rule is not applicable in the present case.

¶95     Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ JIM RICE


We concur:

/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER