167 So.2d 77 (1964)
William S. FRATES, Appellant,
v.
Perry NICHOLS, William C. Gaither, Walter H. Beckham, Jr., William R. Colson and J.B. Spence, Appellees.
Peter T. FAY, Appellant,
v.
Perry NICHOLS, William C. Gaither, Walter H. Beckham, Jr., William R. Colson and J.B. Spence, Appellees.
Perry NICHOLS, William C. Gaither, Walter H. Beckham, Jr., William R. Colson and J.B. Spence, Appellants,
v.
William S. FRATES, Appellee.
Nos. 63-454, 63-455, 63-478, 63-456, 63-457, 63-477, 63-475, 63-476.
District Court of Appeal of Florida. Third District.
September 1, 1964.
As Amended on Denial of Rehearing September 24, 1964.
*79 Paul & Sams and P.D. Thomson, Miami, for Frates & Fay.
Mershon, Sawyer, Johnston, Simmons & Dunwody, Sam Daniels, Miami, for Nichols, Gaither, Beckham, Colson & Spence.
Before CARROLL, HORTON and HENDRY, JJ.
HENDRY, Judge.
These consolidated appeals[1] and cross-appeals are from orders of the chancellor determining the rights of the respective parties to legal fees in the amount of $200,577.70.
Messrs. Nichols, Gaither, Green, Frates, Beckham, Colson & Spence, as capital partners in conjunction with Daniels, Fay and others as non-capital partners, were, prior to February 28, 1961 practicing law under the firm name of Nichols, Gaither, Green, Frates & Beckham pursuant to a written agreement. Green, Frates, Daniels and Fay all left the firm as of February 28, 1961. Frates and Fay went into practice together as partners. The remaining members of the firm, pursuant to the partnership agreement, continued in practice, under the name of Nichols, Gaither, Beckham, Colson & Spence. This successor firm retained all of the assets of the predecessor firm of Nichols, Gaither, Green, Frates & Beckham, including those clients that were clients of the old firm prior to February 28, 1961.
Frates took with him when he left ten negligence cases of clients of the old firm.[2] Eight of these cases resulted in fees.[3] These appeals challenge the propriety of the chancellor's ruling in regard thereto.
The chancellor awarded fees to Nichols, Gaither, Beckham, Colson & Spence in six of the cases.[4] In the Bowling case he awarded half of the fee ($4,558.225) to Frates & Fay, and the other half to Nichols, Gaither, Beckham, Colson & Spence. A fee of $120,000 in the Stewart case was awarded to Frates on the theory that the client had "cause" to discharge the old firm and hire Frates.
Frates appeals from the chancellor's award of six fees to Nichols, Gaither, Beckham, Colson & Spence. Nichols, Gaither, Beckham, Colson & Spence appeal from the order granting one fee to Frates and half of the other fee to Frates. Fay appeals from the chancellor's order which denies him any interest, as a partner in the firm of Frates & Fay, of the six fees earned by Frates & Fay, but given by the chancellor to Nichols, Gaither, Beckham, Colson & Spence.
It will serve no purpose to detail the events which lead up to and immediately *80 precede the dissolution date of February 28, 1961.[5]
We first decide that in regard to all of these eight fees, there is no significant distinction, and therefore, whatever disposition is subsequently determined to apply, this result will be in regard to all of the fees. The chancellor treated two of the eight fees differently. In one he found that there was no contract between the old firm and Bowling, and therefore, Article X of the partnership agreement (to be discussed infra) did not control the disposition of this case. Accordingly the chancellor decreed that the fee should be divided evenly. We do not agree.
In regard to the Stewart fee of $120,000 the chancellor found that the client had "cause" to discharge the firm of Nichols, Gaither, Green, Frates & Beckham, accordingly, her contract with Frates & Fay is valid. The only "cause" for discharge relied upon by Mrs. Stewart took place in her home after she had retained Frates & Fay. When a member of the old firm visited her, she had already written a note indicating that she wanted Frates & Fay to represent her. The attempted retention of Frates & Fay occurred at the time this note was written, and any later developing "cause" could not operate ab initio. A formal signing of a retainer agreement by Mrs. Stewart with Frates & Fay thereafter, had no legal effect, as it was only a formality.
Now that we have arrived at the proposition that all eight fees are to be disposed of in the same manner, we must determine the manner.
At the outset, in order to determine the outer limits of the controversy, we hold that the retainer agreements the clients signed with the firm of Frates & Fay were a nullity.
Frates has energetically contended that upon the dissolution of the firm of Nichols, Gaither, Green, Frates & Beckham on February 28, 1961 the retainer agreements between that firm and its clients were dissolved. As a result, the subsequent agreements signed with ten of the clients by Frates superseded any rights which the old partnership might have had in the fees subsequently recovered, exclusive of a quantum meruit fee in behalf of the old firm prior to succession.
Although never having been passed on by a Florida court, the proposition is universally accepted that a law partner in dissolution owes a duty to his old firm to wind up the old firm's pending business, and that he is not entitled to any extra compensation therefor.[6]
The dissolution date of February 28, 1961 did not put an immediate end to the partnership, it continued for the purpose of winding up its affairs,[7] and inasmuch as Frates had a duty to wind up the affairs of the partnership, his signing of a retainer agreement with an already existing client was without consideration and void.
It is true, as Frates contends, that these clients could have discharged the firm at any time and retained new lawyers, but that did not occur here. All these clients, who signed retainer agreements with Frates, did, was to manifest their intention of retaining Frates to fulfill the continuing obligation of the firm of Nichols, Gaither, Green, Frates & Beckham,[8] to them.
*81 We adopt the rule recognized by our sister states that the retention of a law firm obligates every member thereof to fulfilling that contract, and that upon a dissolution any of the partners is obligated to complete that obligation without extra compensation.[9]
Inasmuch as we have now rejected Frates' contention that he is entitled to retain all of the fees, we must deal with his former partners' contention that he is entitled to none of the fees. Based upon the previously stated proposition, and absent a partnership agreement to the contrary, Frates would be entitled to his partnership interest of 16.27907% in the fees here involved. Frates' former partners claim that these cases were assets of the firm, not net-accrued fees,[10] therefore, he is not entitled to any part. We agree that these cases were assets of the old firm, and that they were not net-accrued fees as of February 28, 1961, but we do not agree that Frates is entitled to nothing.
Nichols, Gaither, Beckham, Colson & Spence claim that these fees are controlled by Article X of the partnership agreement.[11]
It is evident from the manner in which this portion of the agreement was drawn that the parties hoped by this agreement to induce the partners to refrain from voluntarily *82 withdrawing. In a firm largely devoted to litigation, such as this, where almost all of the fees are contingent, a withdrawing partner would be giving up a great financial expectation by simply receiving his net accrued fees. By far, the greater portion of the firm's assets would be, and actually were, in the cases then pending in the office. This intention, of curtailing voluntary withdrawal, was further manifested by the fact that Article X provided for a larger payment to an involuntarily withdrawing partner than to a voluntarily withdrawing partner.
Article X further provided that the withdrawing partner would have no other interest in the cases of the firm, than was provided by the agreement. It is obvious that the contracting parties intended that the withdrawing partner would leave all of the pending cases for the remaining partners to complete. The parties did not foresee, nor did they provide for the situation where, as here, the withdrawing partner completed some of the pending cases. We therefore are of the opinion that the partnership agreement is not determinative of the fees involved in the present litigation.
Nichols, Gaither, Beckham, Colson & Spence's contention that our previous opinion in regard to another aspect of this litigation is determinative of this issue as "law of the case" is not accepted. It is true that this court previously construed Article X of the partnership agreement, but it was with regard to another unrelated part. In the prior litigation, we determined that Frates was a voluntarily withdrawing partner, not as he claimed, an involuntarily withdrawing partner, and therefore was only entitled to receive that amount of money, in dissolution, provided for by Article X of the partnership agreement.
This court did not pass upon, nor was the question before it, as to the distribution of the fees here involved.
Inasmuch as the partnership agreement is not applicable for purposes of resolving this dispute we must apply common law principles.
As previously noted a partner is under a duty to wind up the partnership affairs without being entitled to receive extra compensation for so doing.[12] But the proposition that a partner is not entitled to extra compensation for winding up the partnership affairs, does not mean, as Nichols, Gaither, Beckham, Colson & Spence contended, that this partner is entitled to no compensation. He is entitled to some compensation.
To argue as Nichols, Gaither, Beckham, Colson & Spence do, that payment of over $45,000 to Frates for net-accrued fees is compensation for his winding up cases for the old firm, is incorrect. That money was paid not for services performed to the partnership, but in lieu of his partnership interest or capital account. Stated in accounting terms, Frates was paid that money for his assets in the firm, and his winding up the cases entitled him to income for his services. The partners by paying him for his share of the net-accrued fees were paying for past services, not the present services expended in earning $200,577.70 in fees.
We agree with the trial court that these cases were assets of the old firm[13] being wound up by Frates for them, and inasmuch as Article X of the partnership agreement does not control, Frates is entitled to receive his partnership share (16.27907%) of the net fee in each such case.
Insofar as Fay's appeal is concerned, we affirm the trial court's action. *83 As previously noted, it was stipulated that Fay had nothing to do with bringing any of these clients to Frates & Fay. It necessarily follows that any rights Fay would have depend on and are no better than Frates' rights thereto, and are a matter of contract between Frates and Fay.
Accordingly the orders appealed are affirmed in part, reversed in part and remanded for proceedings consistent herewith.
NOTES
[1] This is the second appearance of some phase of this litigation before this court. For our prior opinion see Frates v. Nichols, Fla.App. 1962, 140 So.2d 321.
[2] It was stipulated by the parties that Fay had nothing to do with bringing these cases to the firm of Frates & Fay, and that they all came over because of Frates. Frates, subsequent to leaving the firm, signed a retainer agreement with each of these ten clients in the name of the firm of Frates & Fay.
[3] MacDougal v. F.E.C. $ 3,526.27
2. Williams v. F.E.C. 9,994.98
3. West v. F.E.C. 51,600.00
4. Bowling v. So. Railway Co. 9,116.45
5. Stewart v. F.E.C. 120,000.00
6. Ford v. Seaboard 4,000.00
7. McCarroll v. F.E.C. 1,740.00
8. Hamilton v. F.E.C. 600.00
 ____________
 $ 200,577.70

[4] MacDougal v. F.E.C., Williams v. F.E.C., West v. F.E.C., Ford v. Seaboard, McCarroll v. F.E.C. and Hamilton v. F.E.C.
[5] It is uncontested that the firm of Nichols, Gaither, Green, Frates & Beckham was dissolved on February 28, 1961, and succeeded by the firm of Nichols, Gaither, Beckham, Colson & Spence from March 1, 1961.
[6] Platt v. Henderson, 227 Or. 212, 361 P.2d 73 (1961); Walker v. Goodrich, 16 Ill. 341 (1855).
[7] Price v. Drew, 18 Fla. 670 (1882); 24 Fla.Jur., Partnership §§ 146-147.
[8] Tischler v. Kurtz, 35 Fla. 323, 17 So. 661.
[9] Shelley v. Smith, 271 Mass. 106, 170 N.E. 826 (1930); Felt v. Mitchell, 44 Ind. App. 96, 88 N.E. 723 (1909); Note 6, supra; Annotation, 78 A.L.R.2d 280 (1959).
[10] The briefs indicate that two of the six fees awarded to Nichols, Gaither, Beckham, Colson & Spence were net-accrued fees and pursuant to Article X of the partnership agreement, Frates would be entitled to 16.27907% of these fees. In view of our ruling in this case the issue raised in regard to these two fees is moot.
[11] "1. Upon the withdrawal of any partner, if the remaining partners shall have elected to continue the partnership business, or upon the expulsion of any partner, his sole and only interest in the partnership and its business shall consist of the amount standing to his credit in his individual capital account as of the effective date of his withdrawal or expulsion; the amount standing to his credit and his individual income account as of the effective date of his withdrawal or expulsion; and his share of the net fees thereafter received from cases settled or reduced to judgment prior to such effective date and in connection with which no retrial is required and which shall hereinafter be referred to as `accrued net fees'. Such withdrawing or expelled partner shall have no other interest of any nature or kind whatsoever in the partnership, its accounts, its cases then in process, or any business or fees thereafter received. In the event one or more members shall withdraw or be expelled, then the offices of the partnership shall be retained by the majority in number and interest. The remaining partners shall pay over or cause to be paid over to such withdrawing or expelled partner, in cash, the sum of the aforesaid amounts standing to his credit in his individual capital account and his individual income account within thirty days after the effective date of such withdrawal or expulsion, and shall pay over or cause to be paid to him, his share of such accrued net fee; provided, however, that at the option of the remaining partners, the amount standing to the credit of such voluntarily withdrawing partner in his individual capital account may be paid over to him at the times and in the manner following: one-fourth thereof on or before thirty days from the date of such withdrawal; one-fourth thereof on or before one year from the date of such first payment; one-fourth thereof on or before two years from the date of such first payment; and the remaining balance thereof on or before three years from the date of such first payment. In the event such option is exercised by the remaining partners said deferred payments shall be evidenced by the promissory note or notes of the remaining partners, and such deferred payments shall bear interest on the amount thereof remaining unpaid from time to time at three per cent (3%) per annum, which interest shall be paid annually. In the event of the voluntary withdrawal of a partner, if the other partners fail to exercise their right to continue the business of partnership, the affairs of the partnership shall be terminated and wound up as in the case of dissolution by consent of all the partners."
[12] Note 9, supra.
[13] We differ with the trial court, as previously noted, in that, we treat all eight cases alike.