963 So.2d 813 (2007)
Christopher M. LARMOYEUX, Jr., individually and as partner of Montgomery & Larmoyeux, n/k/a Montgomery & Larson, a Florida general partnership, Appellant,
v.
Robert M. MONTGOMERY, Jr., individually and as a general partner of Montgomery & Larmoyeux, n/k/a Montgomery & Larson, a Florida general partnership, and Montgomery & Larmoyeux, n/k/a Montgomery & Larson, a Florida general partnership, Appellees.
No. 4D06-1400.
District Court of Appeal of Florida, Fourth District.
August 1, 2007.
Rehearing Denied October 2, 2007.
*815 Jane Kreusler-Walsh, Barbara J. Compiani, and Rebecca Mercier-Vargas of Kreusler-Walsh, Compiani & Vargas, P.A., and Patrick J. Casey of Boose Casey Ciklin Lubitz Martens McBane & O'Connell, West Palm Beach, for appellant.
James W. Beasley, Jr., and Robert J. Hauser of Beasley Hauser Kramer Leonard & Galardi, P.A., West Palm Beach, for appellees.
POLEN, J.
Christopher M. Larmoyeux timely appeals a final judgment taxing attorney's fees. We affirm the final judgment.
In 1989, Robert M. Montgomery, Jr. ("Montgomery") and Christopher M. Larmoyeux, Jr. ("Larmoyeux") formed a general partnership for the practice of law, Montgomery & Larmoyeux ("the Firm"). They signed a written partnership agreement ("the Agreement") to formalize this relationship. Under the Agreement, Montgomery had a 99% interest and Larmoyeux a 1% interest. Montgomery was managing partner with full managerial and administrative authority. Partners shared in the net profits of the Firm in proportion to their partnership percentage, subject to Montgomery's discretion to pay additional bonuses to Larmoyeux. However, Montgomery could terminate Larmoyeux with or without cause upon thirty days notice. Upon termination, Larmoyeux would have no right or interest in the Firm or any of its assets, clients, files, records or affairs. All of his interest in the partnership would expire automatically. Finally, Larmoyeux agreed to pay the Firm 80% of any fees and costs received in any case in which he continued his representation of a firm client after his departure from the Firm, notwithstanding the termination provisions of the Agreement.
In 1994, the Firm and nine other law firms agreed to represent the State of Florida on a contingent-fee basis in the State's case against the nation's largest tobacco companies. The case settled three years later while Montgomery was choosing a jury. The financial settlement was complex and payable over time, but was announced to be worth over $11 billion to the state.
Towards the end of 1998, a panel of arbitrators awarded the state's consortium of attorneys, including the Firm, over three billion dollars in attorneys' fees. The Firm's share of the fees was approximately 6%, or about $206 million to be paid in installments over an indefinite amount of time (the "Tobacco Fees").
Montgomery and Larmoyeux subsequently signed the first and only amendment to the Agreement ("the Amendment"). They agreed therein that future Tobacco Fees would not be considered assets of the partnership but would be paid out as follows: 75% to Montgomery and 25% to Larmoyeux and their heirs and assigns. From December 1998 through October 2000, the Firm received $40.05 million in Tobacco Fees. Of this amount, the Firm paid $17.35 million to Montgomery and $5.04 million to Larmoyeux as partnership distributions. Thereafter, the Firm expected to receive several million dollars annually in installments of Tobacco Fees for an indefinite period.
In December 2000, Montgomery gave notice to Larmoyeux that the latter would be terminated and disassociated from the Firm effective thirty days later. Although *816 section 4.3.B of the Agreement stated that Larmoyeux would have no further interest in the Firm after his termination, Larmoyeux took the position that the Amendment was a conveyance to him of a perpetual 25% interest in the Tobacco Fees to be received by the Firm in the future, even if he were no longer a partner in the Firm. To this effect, Larmoyeux contacted the paying agent responsible for distributing the Tobacco Fees and instructed the agent to send "all future payments of [his] 25%" to him directly.
In response, Montgomery commenced arbitration before the American Arbitration Association ("AAA"). In the brief statement of claim form, Montgomery alleged that Larmoyeux was wrongfully trying to divert the Tobacco Fees to himself and that he was demanding other payments from the Firm to which he was not entitled. Larmoyeux opposed arbitration, claiming that the Tobacco Fees in dispute were not partnership assets, but his own personal assets, and were therefore outside the scope of the arbitration clause. He also filed a complaint in circuit court, seeking a court order compelling Montgomery to grant him access to the Firm's financial and accounting records pursuant to section 620.8403(2), Florida Statutes (2001).[1]
In the circuit court action commenced by Larmoyeux, Montgomery sought an order compelling arbitration of all of Larmoyeux's claims relating to the former partnership. The circuit court granted Montgomery's motion and the arbitration panel ("the Panel") bifurcated the proceedings. In Phase I, the Panel was to construe the Amendment and address the parties' dispute over whether Montgomery owed Larmoyeux 25% of the fees awarded to the Firm for its work representing the state in its suit against the tobacco companies.
Montgomery then brought claims for a declaratory judgment that Larmoyeux had no interest in the Tobacco Fees and for wrongful interference with the payments. Larmoyeux counterclaimed for damages for breach of the Agreement for failure to pay amounts due under it and for failure "to account to Larmoyeux for partnership funds, assets and property." Larmoyeux also sought damages for Montgomery's alleged breach of fiduciary duty, conversion, breach of duty of good faith and fair dealing and interference with client relationships, as well as for punitive damages and injunctive relief. Essentially, Larmoyeux alleged that Montgomery had overcompensated himself, misappropriated and misspent millions in partnership funds, and had failed to account for virtually every firm expense since 1989, including millions of dollars in alleged personal expenditures. In his amended counterclaim, Larmoyeux also sought damages for Montgomery's alleged failure to allow Larmoyeux access to the Firm's books and records.
A few months before the Phase I trial began, the Panel considered Larmoyeux's claims that his partnership interest had been diminished by Montgomery's alleged mismanagement and personal spending. Montgomery moved for summary judgment *817 on these claims. Larmoyeux subsequently filed a motion for partial summary judgment, seeking access to the Firm's books and records as allowed by section 620.8403(2), Florida Statutes (2001), and a determination that Montgomery had breached the Agreement and the statute by denying him access to them. In his fourth motion for partial summary judgment, Larmoyeux asked the Panel to require Montgomery "to account to Larmoyeux for all partnership business matters."
The Panel ruled that Montgomery's alleged spending of partnership funds, even if it took place, could not have adversely affected Larmoyeux's 1% interest. It deferred ruling on Larmoyeux's fourth motion for partial summary judgment, but stated that, "To the extent [Larmoyeux] requires access to certain partnership documents for purposes of discovery at trial, he may request same." The Panel also summarily denied all of Larmoyeux's damages claims except for the alleged breaches of the Agreement to be heard in Phase I.
During Phase I discovery, Larmoyeux successfully obtained production of all the Firm's tax returns and financial statements, Montgomery's personal tax returns and financial statements, and the Firm's general ledger. Because of the nature and complexity of Larmoyeux's claims, the Firm's regular accountant performed pre-hearing analysis, submitted several affidavits and gave depositions. All together, nearly 1,500 pages of financial records, tax returns and accounting schedules were admitted into evidence for the Phase I trial. Four different CPAs were deposed and testified live, and the Firm's bookkeeper was also deposed and testified as to Firm financial and accounting matters.
The Phase I trial took place in December 2001 after approximately eight months of pleadings, motions and discovery, thirteen depositions, five pretrial hearings, five cross-motions for summary judgment and legal briefing. For six days, the parties tried the issue of Larmoyeux's alleged ownership of 25% of the future Tobacco Fees. About a month later, the Panel entered an interim award which held that Larmoyeux was not entitled to any future Tobacco Fees payments received by the Firm after his effective date of departure. The Panel concluded that Larmoyeux was entitled to receive only 25% of the Tobacco Fees received while he was a partner, and awarded him $257,486 plus interest. It also found in favor of Montgomery on Larmoyeux's counterclaims against him, including the claims regarding personal expenses, disassociation and accounting. Larmoyeux's statutory claims for access to the Firm's financial records were declared moot.
In 2002, the parties conducted an additional nine months of discovery, motions and pretrial briefing in anticipation of the Phase II hearing. Phase II of the arbitration proceeding involved Montgomery's claim that Larmoyeux had breached section 4.3.C of the Agreement. This provision required Larmoyeux to pay Montgomery liquidated damages of 80% of the fees and costs Larmoyeux received in cases that originated while he was a partner with the Firm. Montgomery brought claims for a temporary injunction requiring Larmoyeux to deposit all claimed fees into an escrow account, an order enforcing the Firm's charging liens and compelling Larmoyeux to pay liquidated damages.
In December 2002, the Panel entered a final award in which it concluded that Larmoyeux breached the Agreement by failing to pay Montgomery 80% of the fees and costs. Thus, Larmoyeux was required to pay Montgomery $1.986 million for the nine cases in which the former had recovered fees, less the $257,486 plus interest awarded to Larmoyeux in Phase I.
*818 Montgomery subsequently filed a motion in the circuit court to confirm the award. In response, Larmoyeux moved to vacate the award, reasserting many of the contentions that he had made and lost in Phase I and Phase II of the arbitration, i.e., the Panel had no jurisdiction over the tobacco fee claims, the Panel prejudged the case, the decision was tainted by the "corruption and misconduct" of the Chairman of the Panel, and the Panel improperly denied Larmoyeux's statutory right to access all of the partnership books and records. Following a half-day hearing on these issues, the circuit court denied Larmoyeux's motion to vacate and confirmed the arbitration award.
A final judgment was thereafter entered against Larmoyeux for $1,784,354. In the final judgment, the court found that Larmoyeux's termination led to "a partnership accounting dispute" and that the Panel had considered the various claims between Montgomery and Larmoyeux as part of a "partnership accounting" in which Montgomery was the prevailing party  "Larmoyeux was sued as a partner, in a partnership accounting and the Telcon case [from which Larmoyeux owed costs to the Firm] was one aspect of that accounting."
Larmoyeux appealed and, in Larmoyeux v. Montgomery, 892 So.2d 1047 (Fla. 4th DCA 2005), this court per curiam affirmed the final judgment. A month later, this court granted Montgomery's motion for appellate attorney's fees subject to Montgomery ultimately recovering attorney's fees in the circuit court case. The circuit court then bifurcated the issues of entitlement to fees and amount of fees.
In his opposition to Montgomery's claim to trial attorney's fees, Larmoyeux argued that there was neither statutory basis nor equitable basis for such an award. He maintained that any equitable claim for fees under A.J. Richey Corp. v. Garvey, 132 Fla. 602, 182 So. 216 (1938), was unwarranted because neither party had brought an action for dissolution of the Firm or for an accounting. Nevertheless, the circuit court determined that Montgomery was entitled to fees under A.J. Richey. See id. The court recognized that Montgomery "never specifically filed a suit against Larmoyeux for dissolution or an accounting," but found "that the proceedings between Montgomery and Larmoyeux were essentially that of an accounting and dissolution so inextricably intertwined as to completely settle the partnership affairs between them."
Following a hearing which took place a year and a half later, the court entered a final judgment taxing attorney's fees of $644,871 plus costs and prejudgment interest. Larmoyeux filed a motion for rehearing which the court denied. This appeal follows.
Whether RUPA[2]negates A.J. Richey
Larmoyeux first contends that the trial court erred in awarding Montgomery fees under A.J. Richey because that case was overruled by RUPA. We disagree.
Attorney's fees generally cannot be awarded absent a statutory or contractual basis. Cheek v. Bugg, 639 So.2d 144, 146 (Fla. 5th DCA 1994). In A.J. Richey, however, the Florida Supreme Court carved out a limited exception allowing an equitable award of fees where one partner is "forced to bring suit for dissolution and accounting" against another partner. A.J. Richey, 182 So. at 219 (citing Wade v. Clower, 94 Fla. 817, 114 So. 548 (1927)). When the court decided A.J. Richey and first addressed this equitable concept of fees, the terms "dissolution and accounting" had a distinct meaning. At common *819 law and later, under the Uniform Partnership Act (the "UPA"), a partnership was viewed as an aggregate of partners. John W. Larson, Florida's New Partnership Law: The Revised Uniform Partnership Act and Limited Liability Partnerships, 23 Fla. St. U.L.Rev. 201, 206-07 (1995). The partnership dissolved if a partner left the partnership for any reason. See § 620.70, Fla. Stat. (1993) (defining "dissolution" as "the change in the relation of the partners caused by a partner ceasing to be associated in the carrying on, as distinguished from the winding up, of the business").
When a dispute arose among partners, a partner had to bring an equitable action for an accounting before bringing an action at law for damages. See, e.g., Fellman v. Southfield Farms Corp., 747 So.2d 1035, 1037 (Fla. 4th DCA 1999) ("Generally, an accounting between partners or joint venturers is a condition precedent to an action at law between them.") (citing Koros v. Doctor's Special Surgery Ctr. of Jacksonville, Ltd., 717 So.2d 137, 138 (Fla. 1st DCA 1998) ("[A] partner may not sue other partners or the partnership in an action at law regarding a matter within the scope of the partnership until there has been an accounting of the affairs of the partnership. . . .")); see also Laurence v. Soler, 706 So.2d 896, 897 (Fla. 3d DCA 1998) ("[A]n action at law may not be maintained between partners with respect to partnership transactions until there has been an accounting or settlement of partnership affairs.").
Effective January 1, 1996, the legislature amended Florida's partnership law to adopt in substantial part the Revised Uniform Partnership Act ("RUPA") (1994). Ch. 95-242, § 13, Laws of Fla.; see also Larson, supra, at 247. RUPA adopted the "entity theory" of partnership, viewing the partnership as a separate entity rather than an aggregate of individual partners. See § 620.8201(1), Fla. Stat. (2001) ("A partnership is an entity distinct from its partners."). As a result, partnerships no longer automatically dissolve when one partner leaves. See id. Instead, the partners who leave the partnership are "disassociated." §§ 620.8601, 620.8602, Fla. Stat. (2001). As the comments to RUPA explain, "disassociation" is an "entirely new concept" used "to denote the change in relationship caused by a partner's ceasing to be associated in the carrying on of the business." Unif. P'Ship Act § 601, cmt. 1 (1997).
Under RUPA, the term "`[d]issolution' is retained but with a different meaning." Id. Disassociation of a partner no longer necessarily causes a dissolution and end of the partnership as an ongoing business or professional entity. See §§ 620.8601, 620.8801, Fla. Stat. (2001). Instead, the partnership continues and only "dissolves" in certain circumstances. See § 620.8801, Fla. Stat. (2001); see also Unif. P'Ship Act § 601, cmt. 1 (1997) ("Under RUPA, unlike the UPA, the disassociation of a partner does not necessarily cause a dissolution and winding up of the business of the partnership.").
This state's adoption of RUPA also significantly changed the law by eliminating the requirement that partners first sue for an accounting before bringing other claims. The 1996 amendment authorizes a partner to maintain an action against the partnership or another partner for legal and equitable relief, "with or without an accounting as to partnership business," to enforce a partner's rights under the partnership agreement or chapter 620, and to "otherwise protect the interests of such partner, including rights and interests arising independently of the partnership relationship." § 620.8405(2), Fla. Stat. (2001); see also Unif. P'Ship Act § 405, *820 cmt. 2 (1997) ("[A] partner may bring a direct suit against the partnership or another partner for almost any cause of action arising out of the conduct of the partnership business. That eliminates the procedural barriers to suits between partners filed independently of an accounting action.").
In this case, Montgomery disassociated Larmoyeux under RUPA. Therefore, neither party was required to go through the procedural formality of suing for an accounting nor dissolving the partnership, as was necessary under pre-RUPA Florida partnership law. See Fellman, 747 So.2d at 1037. Larmoyeux now contends that, since he was not "forced" to bring an action for accounting, the policy rationale underlying A.J. Richey no longer exists. See Balzam v. Cohen, 427 So.2d 329 (Fla. 3d DCA 1983) (recognizing exception where "one of several co-partners is forced to bring suit for dissolution and accounting") (emphasis added), disapproved on other grounds by Johnson v. Bednar, 573 So.2d 822 (Fla.1991); see also Cooper v. Fulton, 158 So.2d 759, 762 (Fla. 3d DCA 1963) (stating that an exception to the general rule "exists where the plaintiff, as one of several co-partners, is forced to bring suit for dissolution and accounting") (emphasis added), cert. denied, 165 So.2d 161 (Fla.1964). Instead, according to Larmoyeux, the specific fee provisions of RUPA control and authorize fees only as provided by statute. See § 620.8701(9), Fla. Stat. (2001) (stating that court may assess reasonable attorney's fees against a party in an action to determine the buyout price of a disassociated partner in an amount the court finds equitable, where the court finds the party "acted arbitrarily, vexatiously, or not in good faith"). We hold otherwise.
In Carlile v. Game & Fresh Water Commission, 354 So.2d 362 (Fla.1977), the court stated that any legislative intent either to abolish or to limit the common law must indicate such change clearly, or else the rule of common law stands. Id. at 364. Likewise, "A court will not infer that a statute was intended to enact any change in the common law other than what is specified and plainly pronounced." WalMart Stores, Inc. v. McDonald, 676 So.2d 12, 17 (Fla. 1st DCA 1996). When this state adopted RUPA, it did not specifically overrule A.J. Richey. Therefore, we hold that the equitable fees exception established in A.J. Richey survived the enactment of the Act.
Furthermore, we acknowledge that at least two RUPA states have continued to apply common law cost-shifting principles after adopting the revised uniform act. See Horne v. Aune, 130 Wash.App. 183, 121 P.3d 1227, 1236 (2005) (noting that "when a partner breaches his fiduciary duties, a fee award is within the trial court's discretion"); see also Pankratz Farms, Inc. v. Pankratz, 322 Mont. 133, 155-56, 95 P.3d 671 (Mont.) (recognizing trial court's discretion to award attorney's fees under its equity powers in a partnership action despite that state's adoption of RUPA), reh'g denied, 322 Mont. 133, 95 P.3d 671 (2004).
Whether dissolution is required under A.J. Richey
Larmoyeux also argues that the fee award was improper because the equitable fees exception established in A.J. Richey applies only where there has been a dissolution, and none occurred in this case. However, Florida law does not require both a dissolution and an accounting as a prerequisite to award fees under A.J. Richey. See Hiestand v. Geier, 396 So.2d 744, 749 (Fla. 3d DCA 1981) (recognizing that trial court may award attorney's fees, absent contractual or statutory basis, where partner brings an action for accounting *821 or business dissolution) (internal citations omitted); Tobin v. Lefkowitz, 367 So.2d 682, 683 (Fla. 3d DCA 1979) (stating that attorney's fees awardable where "one partner secures an accounting from another") (internal citation omitted); Donald S. Zuckerman, P.A. v. Alex Hofrichter, P.A., 632 So.2d 730, 731 (Fla. 3d DCA 1994) (affirming fees award made under A.J. Richey and Wade, supra, in a suit for partnership accounting).
Dissolution under UPA was not a condition for an accounting; but if an accounting occurred, fees could be awarded. See § 620.665, Fla. Stat. (1993). As explained in Lipsig v. Ramlawi, 760 So.2d 170 (Fla. 3d DCA 2000), a partnership "accounting" triggers the right to attorney's fees under A.J. Richey:
The general rule is that costs including attorney's fee will be allowed . . . in cases of partnership accounting, but even in these cases, the matter is one vested largely in the discretion of the [trial court].
. . . .
As a rule the costs of a suit for a partnership accounting, including the fees of experts and of attorneys, are to be paid out of the partnership estate, or if this is insufficient they are to be borne by the partners in proportion to their respective partnership shares. But, as in other equity suits, the court may exercise discretion in the award of costs, and it not infrequently charges the entire costs to one or some of the partners. . . .
Id. at 190-91 (quoting A.J. Richey and Wade, supra). It is not surprising that some pre-RUPA cases use the terminology "dissolution and accounting," because under UPA, "dissolution" was automatic when a partner left.
Whether there was a partnership accounting
Lastly, Larmoyeux contends that the trial court lacked equitable discretion to award fees under A.J. Richey because the dispute below was not in the nature of an accounting. We disagree. Although neither party made a formal demand for accounting, this case involved its functional equivalent.
In Cheek v. Bugg, 639 So.2d 144 (Fla. 5th DCA 1994), the court held that Bugg, the prevailing partner in a breach of partnership action, was not entitled to attorney's fees under A.J. Richey in part because he did not bring an action for accounting. Id. at 146-47. Instead, Bugg demanded his right to an "appraisal" under the partnership agreement, a term the court found had a distinct meaning which had to be given effect. Id. Thus, Cheek stands for the proposition that absent an "accounting," attorney's fees may not be awarded under A.J. Richey. See id.
In this case, no formal demand for accounting was made. Neither did the parties implicitly agree during the course of the litigation to conduct a formal accounting. See Lipsig v. Ramlawi, 760 So.2d 170, 175 (Fla. 3d DCA 2000) (distinguishing Cheek in finding that fees may be awarded under A.J. Richey if an accounting is held by the implied consent of the parties). Yet Larmoyeux obtained, and the Panel considered, all of the Firm's tax returns and financial statements, Montgomery's personal tax returns and financial statements, and the Firm's general ledger. In addition, four different CPAs were deposed and testified live, and the Firm's bookkeeper was deposed at length, regarding Firm financial and accounting matters. Therefore, the Panel not only had all relevant documents relating to the Montgomery-Larmoyeux partnership, but *822 had, and deliberated on, documentation of the firm's affairs as a whole. This brings the proceedings below in line with a formal accounting, which the Fifth District in Cheek defined as "an `equitable proceeding for a complete settlement of all partnership affairs.'" Cheek, 639 So.2d at 146 n. 3 (quoting Black's Law Dictionary 19 (6th ed.1990)). As such, we find it was within the trial court's equitable discretion to award Montgomery attorney's fees under A.J. Richey.
Based on the foregoing, we affirm the final judgment taxing attorney's fees. We also find that the trial court did not abuse its discretion in determining the amount of fees awarded Montgomery. Accordingly, we affirm on that issue as well. See Centex-Rooney Constr. Co. v. Martin County, 725 So.2d 1255, 1258 (Fla. 4th DCA 1999); see also Brewer v. Solovsky, 945 So.2d 610, 611 (Fla. 4th DCA 2006).
Affirmed.
STEVENSON and TAYLOR, JJ., concur.
NOTES
[1] Section 620.8403(2), Florida Statutes (2001), states:

A partnership shall provide partners and their agents and attorneys access to the books and records of the partnership. The partnership shall provide former partners and their agents and attorneys access to books and records pertaining to the period during which they were partners. The right of access provides the opportunity to inspect and copy books and records during ordinary business hours. A partnership may impose a reasonable charge, covering the costs of labor and material, for copies of documents furnished.
[2] RUPA: Revised Uniform Partnership Act, see § 620.XXXXX-XXX.9902, Fla. Stat. (2006).