[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12039
_____

D.C. Docket No. 1:07-cv-22988-RWG

BUCKLEY TOWERS CONDOMINIUM, INC.,

Plaintiff - Appellee,

ROSENBAUM MOLLENGARDEN JANSSEN & SIRACUSA PLLC,

Interested Party - Appellee,

versus

KATZMAN GARFINKEL ROSENBAUM, LLP,

Interested Party - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(May 20, 2013)

Before DUBINA, Chief Judge, BARKETT and FAY, Circuit Judges.

PER CURIAM:

This case involves the distribution of a contingency fee among law firms when an equity-holding attorney changes law firms multiple times during the course of litigating a single matter and the client follows the exiting attorney to each new firm. Appellant Katzman Garfinkel Rosenbaum, LLP ("KGR"), appeals the district court's adoption of the magistrate's Report and Recommendation granting in part and denying in part KGR's motion to enforce a charging lien for professional services rendered, limiting the value of KGR's lien to $894,897.[1] KGR presents several arguments on appeal for how the court erred in undervaluing its lien, including that the district court failed to properly apply Florida case law—specifically *Frates v. Nichols*, 167 So. 2d 77 (Fla. 3d DCA 1964). After reviewing the briefs and with the benefit of oral argument, we agree that *Frates* governs this matter, but disagree with KGR's suggested application of *Frates*.

I.     Background

The underlying claim began when Buckley Towers Condominium, Inc. ("Buckley"), suffered significant damage during Hurricane Wilma in October 2005. Buckley's insurer, QBE Insurance Corp. ("QBE"), refused payments on the claim and, for assistance, Buckley turned to its longtime counsel, Becker & Poliakoff, P.A. ("B&P"). In October 2007, Buckley retained B&P on an hourly fee basis, and B&P filed the underlying complaint in November 2007. On April

---

[1] We note that Becker & Poliakoff, P.A. ("B&P"), also appealed its recovery of $681,063 under the charging lien it filed in the present matter, but B&P settled its claim and withdrew its appeal.

17, 2008, B&P and Buckley changed their fee arrangement and B&P agreed to represent Buckley on a contingency fee basis. Attorney Daniel Rosenbaum—an equity shareholder at B&P— led the litigation team that handled the Buckley litigation.

On August 4, 2008, Rosenbaum left B&P to form the new firm Katzman, Garfinkel & Rosenbaum, LLP ("KGR"). Buckley followed Rosenbaum, signing a contingency fee agreement with KGR on August 26, 2008, and B&P then filed a notice of a charging lien with the district court. KGR completed the remaining pre-trial proceedings and represented Buckley through a 10-day jury trial. On May 14, 2009, the district court entered a final judgment of over $24 million in Buckley's favor. QBE appealed the final judgment and KGR remained counsel through briefing on the appeal.

In March 2010, Rosenbaum again switched firms, leaving KGR to form Rosenbaum, Mollengarden, Janssen & Siracusa, PLLC ("RMJS"). Again, Buckley followed Rosenbaum to the new firm, signing a contingency fee agreement with RMJS on April 12, 2010. RMJS represented Buckley at oral argument. On December 12, 2010, this Court affirmed in part and vacated in part the final judgment, affirming the actual cost value damages of over $11 million.

3

On Buckley's motion, the district court entered a partial amended final judgment[2] in the amount of $12,035,449 on March 28, 2011. Thereafter, KGR filed its notice of a charging lien, and the court ordered the disputed funds be deposited in the court's registry. QBE issued two checks, one to Buckley and the other to the court's registry to cover the amount contested by the attorneys' charging liens. Prior to Buckley endorsing QBE's check, Buckley terminated its relationship with RMJS and RMJS filed its notice of a charging lien.

More relevant to the issues before this Court, B&P, KGR, and RMJS all moved to enforce their charging liens. After reviewing the law firms' motions, responses, replies, supplemental filings, and exhibits on the record, as well as holding a hearing on the matter, the magistrate issued a Report and Recommendation ("R&R"). The magistrate recommended that the court exercise its ancillary jurisdiction and found that RMJS should receive its 38.5% contingency fee from the partial final judgment, less the quantum meruit of B&P and KGR.[3] In determining the quantum meruit award for B&P and KGR, the magistrate first looked to the fees awarded in Buckley's previously granted motion for attorneys' fees. The magistrate found those fees adequately compensated the law firms for the actual value of their services and recommended KGR receive

---

[2] A portion of the appeal remained pending until the Florida Supreme Court resolved two certified questions.

[3] The parties do not contest the application of Florida law or the total fee award, only the allocation of that total fee among the law firms.

4

$894,897.00 and B&P receive $681,063.00 in fees.  The magistrate valued the total fee award at $4,633,646.86; thus, RMJS was awarded $3,057,687.88.  The district court affirmed and adopted the R&R in its entirety.

Both KGR and B&P appealed the fee award; however, B&P dismissed its appeal after settling its dispute for $1.3 million.[4]  On appeal, KGR argues the district court failed to properly apply Florida law and erred in its distribution of the fees.

II.    Standard of Review

"The charging lien is an equitable right to have costs and fees due an attorney for services in the suit secured to him in the judgment or recovery in that particular suit."  *Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom*, 428 So. 2d 1383, 1384 (Fla. 1983).  However, a charging lien is contractual in nature and in order for a charging lien to be imposed, there must be a contract between the attorney and client.  *See, e.g., id.* at 1385.  This Court "reviews a trial court's award of attorneys' fees for abuse of discretion.  However, a trial court's interpretation of a contract is a matter of law subject to a de novo standard of review."  *US Acquisition, LLC v. Tabas, Freedman, Soloff, Miller &*

---

[4] B&P and RMJS's settlement agreement was approved by the district court and comprised of the $681,063 awarded in the R&R, and an additional $618,937 of the fees awarded to RMJS. *Buckley Towers Condo, Inc. v. QBE Ins. Corp.*, No. 07-22988-civ (S.D. Fla. Aug. 16, 2012) (order to partially release funds held in court registry).

5

*Brown, P.A.*, 87 So. 3d 1229, 1234 (Fla. 4th DCA 2012) (internal quotation and citations omitted).

III.    Analysis

When a party substitutes counsel of record in the midst of litigation, the initial counsel of record is generally entitled to the fees earned during its period of representation.  When the initial counsel of record agrees to take the case on a contingency fee basis, the determination of the fees earned becomes more complicated.  Calculating the fees earned becomes even more complex when the new counsel of record has broken away from the initial counsel of record and the client chooses to follow the exiting attorney to the new firm.  In the instant matter, we are presented with the unique situation of the client choosing to follow an attorney that twice exited the firm representing the client in the midst of litigation. To still further complicate the matter, the exiting attorney held an equity share in both of the firms that he exited.

A.

The law in Florida relating to a firm's right to contingency fees earned after the attorney-client contract is terminated varies depending on the relationship between the initial firm and the subsequent firm representing the client.  When there is no connection between the two firms, the initial firm is entitled to a quantum meruit award, limited by any agreement to a maximum fee award.  *See,*

*e.g.*, *Rosenberg v. Levin*, 409 So. 2d 1016, 1021 (Fla. 1982) (holding "an attorney employed under a valid contract who is discharged without cause before the contingency has occurred . . . can recover only the reasonable value of his services rendered prior to discharge, limited by the maximum contract fee."). When an associate attorney at the initial firm exits the firm and the client follows the associate to a new firm, the initial firm is also entitled to this limited quantum meruit award. *See, e.g.*, *Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Poletz*, 652 So. 2d 366, 368-69 (Fla. 1995) (relying on *Rosenberg* to determine that a simple lodestar calculation is insufficient in determining the initial firm's quantum meruit award). However, when a partner exits the initial firm and the client follows, the initial firm is entitled to the entire contingency fee, less the former partner's partnership share. *Frates*, 167 So. 2d at 82 (holding fees were assets of the initial firm and the former partner is only "entitled to receive his partnership share . . . of the net fee in each such case.").

RMJS questions the present applicability of *Frates*, referring to the case as an outdated ruling. Yet, RMJS fails to cite to any case law in support of this proposition, relying instead on the Revised Uniform Partnership Act ("RUPA") and Florida Rules of Professional Responsibility. This Court finds no case law overturning the *Frates* decision, and does not find that Florida's adoption of RUPA significantly affects the precedent set forth in *Frates*.

In *Frates*, the court was faced with a situation where a partner in a law firm exited the firm and took with him ten ongoing negligence cases of clients of the former firm, eight of which resulted in fees. *Id.* at 79. Finding that the partnership agreement failed to provide for the situation of a withdrawing partner completing some of the pending cases, the court looked to common law and partnership law principles to determine the matter. *Id.* at 81-82. One of the tenets of partnership law relied on by the court is that "a law partner in dissolution owes a duty to his old firm to wind up the old firm's pending business, and that he is not entitled to any extra compensation therefor." *Id.* at 80 (footnote omitted). The court held that the "cases were assets of the old firm being wound up by [the withdrawing partner] for them . . . ." *Id.* at 82 (footnote omitted). Thus, the withdrawing partner was entitled to his partnership share of the fees and the remaining fees were owed to the firm. *Id.*

Effective in 1996, Florida's legislature amended the state's partnership law to adopt a substantial portion of RUPA. *See* Fla. Stat. § 620.81001, *et seq.*; *Larmoyeux v. Montgomery*, 963 So. 2d 813, 819 (Fla. 4th DCA 2007). A key change introduced by RUPA is that partnerships are not automatically dissolved when a partner withdraws. *See* Fla. Stat. § 620.8601(1); Unif. P'Ship Act § 601,

8

cmt. 1 (1997);[5] *Larmoyeux*, 963 So. 2d at 819. Further, under RUPA, partners are "not entitled to remuneration for services performed for the partnership, *except* for reasonable compensation for services rendered in winding up the business of the partnership." Fla. Stat. § 620.8401(8) (emphasis added). Importantly, the uniform comments state "[t]he exception is not intended to apply in the hypothetical winding up that takes place if there is a buyout under Article 7." Unif. P'Ship Act § 401, cmt. 9 (1997). Finally, under RUPA, upon a partner's dissociation, the partner's duties of loyalty and care "continue only with regard to matters arising and events occurring before the partner's dissociation . . . ." Fla. Stat. § 620.8603(2)(c).[6]

While the adoption of RUPA made significant changes to the partnership law of Florida, we do not see that these changes detract from the premises of *Frates*. The commentary to RUPA makes clear that its enactment did not change the existing law as it relates to the fiduciary duties of a withdrawing partner. Moreover, RUPA still supports the premise that partners are not entitled to

---

[5] Sections in Florida's RUPA are consistently numbered with RUPA, so that Florida Statutes section 620.8601 corresponds with the Uniform Partnership Act section 601. However, subsections under Florida's RUPA begin with numerals while RUPA begins subsections with letters, so that Florida Statutes section 620.8401(8) corresponds with Uniform Partnership Act section 401(h).

[6] The uniform comments clarify a partner's fiduciary duties upon dissociation and that "[n]o change from the current law is intended." Unif. P'Ship Act § 603, cmt. 2 (1997). The commentary goes on to provide an example of a partner leaving a brokerage firm, confirming that the withdrawing partner "may immediately compete with the firm for new clients, but must exercise care in completing on-going client transactions and *must account to the firm for any fees received from the old clients on account of those transactions*." *Id.* (emphasis added).

9

additional remuneration during a partner's dissociation. In fact, the example provided in the uniform commentary clearly supports the continuation of the *Frates* rule by stating that dissociated partners must account to the partnership for any fees from ongoing client transactions that are received after dissociation. While it is clear that nothing in RUPA overturns the ruling in *Frates*, we must still determine if *Frates* is applicable or controlling in the present matter.

## B.

To resolve whether *Frates* applies to the present matter, we must determine if *Frates* applies equally to law firms that choose a professional corporation, as opposed to a partnership, as their business entity. This is because the initial law firm representing Buckley was B&P, a professional corporation. We do not believe Florida courts would allow attorneys to shirk fiduciary duties simply by choosing an alternate business entity for their law firm.

When determining a lawyer's fiduciary duties, Florida law generally does not distinguish between lawyers in partnerships and those in professional corporations. The Florida Rules of Professional Conduct do not distinguish between these business entities as to the applicability of responsibilities of partners as supervisory lawyers, Fla. R. Prof. Conduct 4-5.1, cmt., or the applicability of duties owed to clients and procedures for lawyers to exit law firms. Fla. R. Prof. Conduct 4-5.8. Moreover, the Florida Supreme Court has stated

we approved the practice of law in a corporate form subject to the express recognition that under the common law, a lawyer who renders professional services owes a duty of care regardless of the fact that the lawyer is an associate or partner in a business entity that contracts to provide professional services to the injured party.

*Moransais v. Heathman*, 744 So. 2d 973, 978 (Fla. 1999), *receded from on other grounds*, *Tiara Condo Ass'n, Inc. v. Marsch & McLennan Cos., Inc.*, 2013 WL 828003, -- So. 3d -- (Fla. Mar. 7, 2013).

Further, the Second Circuit, applying a New York law similar to *Frates*, found the fiduciary duties owed by a partner withdrawing from a partnership applied equally to a shareholder withdrawing from a professional corporation. *Santalucia v. Sebright Transp. Inc.*, 232 F.3d 293, 299 (2d Cir. 2000). The Second Circuit determined that "the majority of states to confront this issue have extended the familiar fiduciary duty principles of partnerships to professional corporations." *Id.* (collecting cases). As Florida courts do not differentiate between business entities as to fiduciary duties owed to clients and subordinates, we believe Florida courts would follow the majority of states and require the same fiduciary duties be owed to other attorneys and former law firms, whether the firm was a partnership or professional corporation. Thus, we will apply *Frates* equally to law firms formed as partnerships and those formed as professional corporations.

C.

11

The *Frates* court applied the common law, but clearly indicated that law firms can change the fee award a withdrawing attorney is entitled to by agreement. 167 So. 2d at 82.  B&P's stockholder agreement, which was signed by Rosenbaum, contains a section that purports to address the distribution of fees when a shareholder withdraws from the firm.  This section is embedded in the agreement's covenant not to compete.  The agreement states that in the event that a shareholder breaches the covenant not to compete and continues an ongoing matter, the shareholder would compensate B&P the greater of 50% of the fee received or the firm's quantum meruit.

The Florida Supreme Court disapproves of lawyers entering covenants not to compete and other agreements that restrict lawyers' right to practice.  "A lawyer shall not participate in offering or making: (a) a . . . shareholders . . . agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement . . . ."  Fla. R. Prof. Conduct 4-5.6.  Moreover, the comments make clear the public policy behind this rule, as "[a]n agreement restricting the right of lawyers to practice after leaving a firm not only limits their professional autonomy, but also limits the freedom of clients to choose a lawyer."  Fla. R. Prof. Conduct 4-5.6, cmt.  However, "[a] contract is not void, as against public policy, unless it is injurious to the interests of

12

the public, or contravenes some established interest of society." *Neiman v. Galloway*, 704 So. 2d 1131, 1132 (Fla. 4th DCA 1998) (citations omitted).

Florida courts have not used Rule 4-5.6 to invalidate contracts between private parties as a matter of law. *See Lee v. Fla. Dep't of Ins. & Treasurer*, 586 So. 2d 1185, 1188 (Fla. 1st DCA 1991). Yet, *Lee* involved a settlement agreement between non-attorneys wherein the counsel for the plaintiff agreed not to represent a government agency in future proceedings against Mr. Lee. *Id.* at 1187. The court specifically found that Rule 4-5.6

> is intended to prevent lawyers from entering into agreements that operate to restrict a lawyer's right to practice generally . . . that Rule does not reach agreements with or by the client to preclude the lawyer's representation of other persons with respect to cases that involve the same facts, transactions, and events as does the case settled for the client. Failure to give effect to this distinction would defeat the protections of confidential information provided in rules 4-1.6 and 4-1.9.

*Id.* at 1190. Thus, *Lee* is clearly distinct from the instant case, as the agreement between B&P and Rosenberg was between attorneys and operated as a general restriction against Rosenberg's right to practice. Moreover, Florida courts have previously relied solely on professional responsibility rules to invalidate agreements between attorneys relating to fees. *See, e.g.*, *Robert A. Shupack, P.A. v. Marcus*, 606 So. 2d 466, 467 (Fla. 3d DCA 1992) (invalidating a fee sharing agreement because it violated a disciplinary rule found in the predecessor to the Florida Rules of Professional Conduct).

13

The public policy behind prohibiting covenants not to compete is clearly stated in the Rules and has been affirmed in disciplinary actions. *See, e.g.*, *The Fla. Bar v. St. Louis*, 967 So. 2d 108, 121 (Fla. 2007) (finding Rule 4-5.6 promotes public welfare and is constitutionally valid). In an independent matter, Rosenbaum, himself, alleged that the covenant not to compete in B&P's stockholder agreement is void as against public policy. *Rosenbaum v. Becker & Poliakoff, P.A.*, 08-81004-civ, 2010 WL 376309, at *7 (S.D. Fla. Jan. 26, 2010). At least for the purpose of the charging liens at issue, we find that the covenant not to compete and embedded fee distribution are not controlling and will apply the common law in distributing the total fee award.[7] Therefore, the proper distribution of the contingency fees in this case is determined by *Frates*.

## D.

While *Frates* applies to both partnerships and professional corporations, we are currently presented a situation where a partner exits the initial firm, but thereafter exits from the second firm during the same ongoing matter. Applying a "*Frates* within *Frates*" analysis, the common law solution seems to indicate that the second and third firms would share the exiting partner's share, with the third firm's fee being determined by the second firm's partnership agreement. However,

---

[7] As the issue before the Court is the validity and value of the charging liens of KGR and RMJS, nothing in this opinion prevents the attorneys from seeking alternative contractual remedies in state court, as between themselves.

14

it is the exiting attorney and not the subsequent firm that owes the fiduciary duties to wind up the initial partnership's business, and it is these fiduciary duties that are at the heart of *Frates*.  When a firm with no fiduciary duties to wind up another firm's affairs works on a matter for a contingency fee, and the contingency occurs during another firm's representation, the amount of the firm's fee in the matter is determined by quantum meruit.  *See Rosenberg*, 409 So. 2d at 1021; *Poletz*, 652 So. 2d at 368.

In the present matter, Rosenberg, not the other attorneys at KGR, had the pre-existing duty to represent Buckley.  The remaining attorneys at KGR did not owe fiduciary duties to wind up B&P's affairs, but worked on Buckley's case on a contingency fee basis.  Since that contingency occurred while RMJS was counsel of record for Buckley, KGR is entitled to a quantum meruit award of fees.

E.

While the district court did not apply a proper *Frates* analysis, the court did determine a quantum meruit award for KGR.  We find that the district court abused its discretion by awarding KGR a quantum meruit award of $894,897.  "An abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous."  *Johnson v. Breeden*, 280 F.3d 1308, 1326 (11th Cir. 2002) (quotation omitted).

15

In determining the reasonable value of an attorney's services, the court should consider the totality of the circumstances surrounding the professional relationship, including time spent on the matter, the recovery sought, the skill demanded, the results obtained and the attorney-client contract. *Rosenberg*, 409 So. 2d at 1022. While the trial court may consider a lodestar calculation in determining a firm's quantum meruit, the court errs as a matter of law if it fails to consider "other factors surrounding the professional relationship that would assist the court in fashioning an award that is fair to both the attorney and client," such as the reason the firm was discharged, actions taken by the firm or client before or after discharge, and the benefit actually conferred on the client. *Poletz*, 652 So. 2d at 369. Moreover, "[u]nlike an award of attorney's fees to a prevailing party, a quantum meruit award must take into account the actual value of the services to the client."[8] *Id.*

The magistrate based the amount of KGR's fee award on Buckley's successful motion seeking attorney's fees from QBE. While a lodestar calculation is not an improper starting point, the magistrate failed to properly consider the totality of the circumstances, particularly the benefit conferred on the client. On March 26, 2009—after the jury trial but prior to the first appeal to this Court—

---

[8] The *Poletz* court also found that the lodestar calculation was intended to apply to fees imposed ancillary to the primary action against a non-client and is ill-suited for the task of assessing attorney's fees due by a client under a quantum meruit analysis. 652 So. 2d at 368-69.

Buckley filed its initial motion for entitlement to attorney's fees, arguing it was entitled to recover attorney's fees from QBE based on a Florida Statute permitting fee shifting in claims enforcing an insured's rights under an insurance contract. For KGR's portion of the fees, Buckley sought an award of $2,695,436.87.[9] After the court ordered the parties to meet and confer, Buckley filed an amended motion for attorney's fees (again prior to the first appeal to this Court), stating that the parties had reached an agreement as to a lodestar amount for KGR's work at $894,897, but disagreed as to the application of a risk multiplier in the case. Thereafter, the magistrate denied the application of a risk multiplier and the court ordered QBE to pay Buckley $894,897 for KGR's work on the matter.

In calculating KGR's quantum meruit, the magistrate used the previously determined lodestar amount as a starting point. The magistrate concluded that this award sufficiently accounted for the length of the attorney-client relationship, the risk of non-recovery, and the skills required in the case. However, the magistrate failed to properly account for the totality of the circumstances and apply the remaining *Poletz* factors, including the benefit actually conferred on the client. Specifically, in addition to Buckley's motion for fees against QBE, this Court granted Buckley's application for appellate attorney's fees and remanded to the district court for its consideration as to a reasonable amount of fees. Buckley

_____

[9] Buckley argued that KGR was entitled to a lodestar calculation of $1,026,717 and a contingency multiplier of 2.25.

sought fees in the amount of $75,232.50 for the appellate work of KGR.[10]  The district court abused its discretion by not accounting for the benefit conferred on the client by KGR while it worked on post-trial matters and briefed the first appeal before this Court.

While we appreciate the magistrate's focus on judicial efficiency and ruling in equity, it was improper to value KGR's charging lien without considering the significant work KGR did on the appeal.  Thus, we must remand the matter back to the district court to properly consider the *Rosenberg* and *Poletz* factors, including the benefit conferred on Buckley by KGR's representation throughout the trial and the preliminary appellate work.

## F.

In the end, while the magistrate applied an incorrect legal standard and did not fashion an award that fairly compensated KGR, there is only one issue to be decided on remand—KGR's proper quantum meruit award.[11]  Under a proper

---

[10] For reasons not obvious from the record, Buckley withdrew its motion for appellate attorney's fees, despite the fact that QBE did not challenge Buckley's entitlement to the appellate attorney's fees.  However, Buckley's withdrawal of the motion is irrelevant for our analysis because an attorney's quantum meruit award does not hinge on whether an opposing party is liable for fees. *See Poletz*, 652 So. 2d at 368 ("fair value attorney fee recoverable in quantum meruit is not measured by the standards applied when fees are awarded opposing party under fee-shifting statute or doctrine" (citing Restatement (Third) of The Law Governing Lawyers, Tentative Draft No. 4 § 51 (Apr. 10, 1991))).

[11] We do not intend to significantly burden the district court with this decision, and think it within the district court's discretion to simply reconsider the amount of KGR's quantum meruit award based on the arguments and evidence previously submitted to the court, or, if the district court deems it more appropriate, to allow the parties to re-argue the issue.

application of *Frates* and *Poletz*, the value of KGR's charging lien should be the firm's quantum meruit.  Once the amount of KGR's charging lien is determined, the value of RMJS's charging lien can be determined based on Rosenbaum's equity share as set forth in B&P's controlling stockholder agreement, which provides that Rosenberg owned 20 of the 855 outstanding shares.  Therefore, RMJS is entitled to 20/855—or approximately 2.34%— of the fee award remaining after KGR is compensated.[12]

IV.    Conclusion

Accordingly, we reverse the district court's order on KGR's and RMJS's motions to enforce their charging liens, and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

---

[12] We note that because B&P settled its claim for $1.3 million, it is entitled to no greater award than that amount to which it agreed.  *See Rosenberg*, 409 So. 2d at 1022 (limiting an attorney's fee recovery to the contract fee agreed to by the attorney).  Consequently, any award that B&P would be entitled to above the $1.3 million agreed-upon amount should be returned to Buckley. For example, if the magistrate determines KGR's quantum meruit award to equal the $894,897 awarded plus the $75,232.50 sought in appellate fees, for a total of $970,129.50, then (a) RMJS would be entitled to $85,696.31 (approximately 2.34% of the remaining $3,663,517.36); (b) B&P would be entitled to its $1.3 million; and (c) the remaining $2,277,821.05 set aside in the court registry for the charging liens would be returned to Buckley.  This example is used entirely for demonstrative purposes and is not intended to dissuade the district court from using its sound discretion to determine a proper value for KGR's charging lien.

19